IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
|  | : |  |  |
|  | : |  |  |
| **IN RE GRAND JURY SUBPOENA** | : | **Misc. No.** | _____ |
|  | : |  |  |
|  | : |  |  |

**MIKE LEVINE'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
UNDER SEAL MOTION TO QUASH GRAND JURY SUBPOENA**

John S. Darden
D.C. Bar. No. 999206
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037-1350
Tel:    (202) 457-6427
Fax:    (202) 457-6315
jdarden@pattonboggs.com

Counsel for Mike Levine

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    The Somalia-Minneapolis Story ........................................................2

    B.    Mike Levine's Reporting on the Somalia-Minneapolis Story ................................6

    C.    Mike Levine's July 2, 2009 News Report ...............................................8

    D.    The Somali Defendants.................................................................9

        1.    Kamal Said Hassan ................................................................9

        2.    Abdifatah Yusuf Isse..............................................................10

        3.    Salah Osman Ahmed...............................................................10

        4.    The defendants' release from custody by the district court ......................11

    E.    The Subpoena to Mike Levine ...........................................................12

ARGUMENT ....................................................................................................................16

    A.    The Subpoena Should Be Quashed Because It Is Unreasonable and
        Oppressive Under Rule 17(c).........................................................16

        1.    The Legal Standard................................................................16

        2.    The Department of Justice Guidelines for Subpoenas to
            Members of the News Media....................................................17

        3.    The Subpoena to Mike Levine Should Be Quashed ................................20

            a.    The Government's Interest In This Matter Is
                Minimal.................................................................20

                i.    The information attributable to "law
                    enforcement sources" was already public
                    knowledge.........................................................20

ii.      The justifications for Rule 6(e) do not apply to the information sought in the subpoena in this case ..........................................................................20

iii.     The confirmations from "law enforcement sources in the July 2 news report resulted from good journalistic technique, not leaks ......................22

b.      Mr. Levine's Interest In This Matter Is Substantial ......................22

B.     The Subpoena Should Be Quashed Because It Seeks Information Protected From Disclosure by the Reporter's Common Law Privilege ..........................................................................................................25

1.     The Legal Standard for Recognition of Common Law Privileges..............................................................................................26

2.     This Court Should Recognize a Common Law Reporter's Privilege .................................................................................................27

3.     A Balance of Interests Requires that the Subpoena Be Quashed on These Facts.............................................................................32

C.     The Subpoena Should Be Quashed Because It Invades Mr. Levine's First Amendment Rights .......................................................................34

CONCLUSION.................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Branzburg v. Hayes,
    408 U.S. 665 (1972)...........................................................................................34, 35

Douglas Oil Co. v. Petrol Stops Northwest,
    441 U.S. 211 (1979)..................................................................................................21

Estes v. Texas,
    381 U.S. 532 (1965)..................................................................................................27

Hatfill v. Mukasey,
    Civil Action No. 03-1793 (RBW)............................................................................24

In re Grand Jury Investigation of Possible Violation of 18 U.S.C. 1461 et seq.,
    706 F.Supp.2d 11 (D. D.C. 2009)............................................................................24

*In re Grand Jury Subpoena, Judith Miller,
    438 F.3d 1138 (D.C. Cir. 2006)...............................................................................21

*In re Grand Jury Subpoena, Judith Miller,
    438 F.3d 1141 (D.C. Cir. 2006) ....................................................................... *passim*

In re IBM Peripheral EDP Devices Antitrust Litigation,
    77 F.R.D. 39 (N.D. Cal. 1977).................................................................................23

In re Sealed Case,
    192 F.3d 995 (D.C. Cir. 1999).................................................................................21

*Jaffee v. Redmond,
    518 U.S. 1 (1996)................................................................................................26, 27

Lee v. Department of Justice,
    413 F.3d 53 (D.C. Cir. 2005)...................................................................................24

*New York Times Co. v. Gonzales,
    459 F.3d 160 (2d Cir. 2006)....................................................................................31

Saxbe v. Washington Post Co.,
    417 U.S. 843 (1974)...........................................................................................34, 35

Trammel v. United States,
    445 U.S. 40 (1980)...................................................................................................26

i

U.S. C.F.T.C. v. McGraw-Hill Companies, Inc.,
  507 F. Supp.2d 45 (D.D.C. 2007) ........................................................................30

United States v. Ahn,
  231 F.3d 26 (D.C. Cir. 2000), *cert. denied sub nom.*, Ahn v. United States, 532 U.S.
  924 (2001) ............................................................................................................30

United States v. Bergeson,
  425 F.3d 1221 (9th Cir. 2005) ................................................................16, 17, 20

United States v. Burke,
  700 F.2d 70 (2d Cir. 1983)..................................................................................35

United States v. Chi Mak,
  8:05-cr-00293 (C.D. Cal. July 24, 2008) .......................................................24, 25

*United States v. Cuthbertson,
  630 F.2d 139 (3d Cir 1980).............................................................................31, 35

United States v. Hassan,
  Case No. 0:09-cr-00038-MJD................................................................................9

United States v. Hubbard,
  493 F. Supp. 202 (D.D.C. 1979) ........................................................................30

United States v. Isse,
  Case No. 0:09-cr-000501-MJD.......................................................................10, 11

United States v. LaRouche Campaign,
  841 F.2d 1176 (1st Cir. 1988)............................................................................35

United States v. R. Enterprises, Inc.,
  498 U.S. 292 (1991)......................................................................................16, 24

United States v. Weber Aircraft Corp.,
  465 U.S. 792 (1984).............................................................................................26

Upjohn Co. v. United States,
  449 U.S. 383 (1981).............................................................................................26

Zerilli v. Smith,
  656 F.2d 705 (1981).............................................................................................27

Zurcher v. Stanford Daily,
  436 U.S. 547 (1978).............................................................................................34

## OTHER AUTHORITIES

U.S. Const. amend. I ...........................................................................................2, 34, 35

ii

28 C.F.R. § 50.10 ............................................................................................................ *passim*

Fed. R. Crim. P. 6(e) ....................................................................................................... *passim*

*Fed. R. Crim. P. 17(c) ..............................................................................................2, 16, 17, 24

*Fed. R. Evid. 501 ............................................................................................................26, 34

Local Criminal Rule 6.1 ...........................................................................................................1

iii

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  | : |  |  |
|---|---|---|---|
|  | : |  |  |
| **IN RE GRAND JURY SUBPOENA** | : | **Misc. No.** | _____ |
|  | : |  |  |
|  | : |  |  |

### MIKE LEVINE'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF UNDER SEAL MOTION TO QUASH GRAND JURY SUBPOENA

Mike Levine, by and through undersigned counsel, respectfully submits, under seal and pursuant to Local Criminal Rule 6.1, this statement of points and authorities in support of his motion, also filed under seal, to quash a grand jury subpoena issued to him for documents and testimony related to his confidential sources as a member of the news media. In support of his motion to quash, Mr. Levine hereby adopts, as if fully set forth herein, the arguments, declarations, points, and authorities submitted by intervenor Fox News Network LLC filed contemporaneously herewith, and further states in support of his motion as follows:

### INTRODUCTION

Mr. Levine is a reporter and producer for Fox News Network, LLC ("Fox News") who covers the Department of Justice and the Department of Homeland Security.

A grand jury subpoena has been issued to Mr. Levine to reveal the names of confidential law enforcement sources referenced in a July 2, 2009 news report entitled "Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say." In seeking the names of confidential sources, the subpoena would endanger Mr. Levine's ability to uphold the public's interest in government affairs, would impair his ability to help the public stay informed, would inhibit his ability to gather and report the news on an ongoing basis, and would destroy his relationship with existing confidential sources. Simply put, this subpoena goes to the heart of

5166564                                          1

what it means to be an investigative reporter in the United States of America covering a beat that includes the Department of Justice and the Department of Homeland Security.

The subpoena should be quashed because it is oppressive and unreasonable under Fed. R. Crim. P. 17(c).  In addition, the subpoena violates the federal common law reporter's privilege, which should once and for all be recognized by this Court.  Finally, the subpoena is an unconstitutional violation of the First Amendment guarantee of freedom of the press.  On the facts of this case, the government's interest in enforcing the subpoena and requiring disclosure is far outweighed by the violence such disclosure would do to Mr. Levine personally and to the newsgathering function that is essential to our democracy.

## BACKGROUND

### A.    The Somalia-Minneapolis Story

Minneapolis, Minnesota is home to a large Somali-American community.  In 2008, reports surfaced that young men from this community were traveling overseas in order to fight with Islamist terrorist groups, including a Somali terrorist organization called al-Shabaab.  *See, e.g.,* "Feds:  Somali Men Disappearing in Minneapolis May Be Recruits for Terrorists," Associated Press, Nov. 27, 2008.[1]

Over time, the story of a connection between Somali-Americans in Minneapolis and al-Shabaab was widely reported on by numerous news organizations, including the Associated Press, the Cleveland Plain Dealer, CNN, The Guardian, KSTP-TV in Minneapolis/St. Paul, Minneapolis Star Tribune, Newsweek, Reuters, The New York Times, and USA Today. Between December 2008 and December 2009, Minnesota Public Radio ("MPR") published

---

[1] Available online at http://www.foxnews.com/story/0,2933,457867,00.html (last visited Apr. 28, 2011).

and/or aired 57 stories as part of a series entitled "Somalis in Minnesota."[2]  Similarly, National

Public Radio ("NPR") published and or aired 19 stories during this same time period for a series

entitled "The Somali-Minneapolis Terrorist Axis."[3]

In addition to this extensive press coverage, the Somalia-Minneapolis story was discussed

openly by high-ranking officials of the U.S. government.  For instance, on February 23, 2009, in

a speech to the Council on Foreign Relations, FBI Director Robert S. Mueller, III referred to a

suicide bombing in northern Somalia carried out by a young man from Minneapolis, saying that

"it appears that this individual was radicalized in his hometown in Minnesota," and that "it raises

the question of whether these young men will one day come home, and, if so, what they might

undertake here."[4]

Congress held hearings on the matter, including a March 11, 2009 hearing before the

Senate Committee on Homeland Security and Governmental Affairs entitled "Al-Shabaab

Recruitment in America," which included testimony from the Associate Executive Director of

the FBI's National Security Branch and the Deputy Director for Intelligence of the National

Counterterrorism Center.[5]  At the congressional hearing, these witnesses made clear that the

government's concern with the overseas travel of Somali-American youth was that they may be

associated with the al-Shabaab terrorist organization.  The Somali community knew this was the

---

[2] Available online at
http://minnesota.publicradio.org/standard/display/project_display.php?proj_identifier=2009/06/01/somali_communit
y (last visited Apr. 28, 2011).

[3] Available online at http://www.npr.org/series/102787287/the-somali-minneapolis-terrorist-axis (last
visited Apr. 28, 2011).

[4] Available online at http://www.fbi.gov/news/speeches/addressing-the-globalization-and-evolution (last
visited Apr. 28, 2011).

[5] Video of hearing available online at
http://hsgac.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=35e68562-1606-409a-9118-
3edfbb8e87c8 (last visited Apr. 28, 2011).

concern as well.  *See, e.g.,* "Feds:  Somali Men Disappearing in Minneapolis May Be Recruits

for Terrorists," Associated Press, Nov. 27, 2008 ("'We hope that this won't be an issue where the

community will be looked at differently,' [Omar] Jamal [executive director of the Somali Justice

Advocacy Center] said. 'Somalis at large are very peaceful people. ... We don't want the Somali

community to be looked at as a group of suicide bombers'.").[6]  The chairman of the committee

hearing even said that he understood there may be arrests of suspected recruiters as part of a

federal probe, to which the FBI official responded, "[t]here are ongoing investigations" and

"[i]t's a significant concern to us."  *See* Somali-Americans recruited as 'cannon fodder',"

Reuters, Mar. 11, 2009.[7]

It was reported that the government had begun a formal "outreach" or "engagement"

program with the Somali community in Minneapolis.  *See, e.g.,* Laura Yuen, "Homeland

Security to meet with Somali community leaders," Minnesota Public Radio, Feb. 4, 2009.[8]

Local FBI officials even appeared on Somali community radio programs to respond to

complaints about whether local mosques were being singled out.  *See, e.g.,* Laura Yuen, "FBI,

Twin Cities Somalis hope to rebuild relationship," Minnesota Public Radio May 19, 2009.[9]

It was also reported that the government was conducting a grand jury investigation into

this matter.  For instance, on March 23, 2009, MPR reported that "[t]he investigation into about a

dozen Somali-American men missing from Minnesota has reached the level of a federal grand

---

[6] Available online at http://www.foxnews.com/story/0,2933,457867,00.html (last visited Apr. 28, 2011).

[7] Available online at http://www.reuters.com/article/2009/03/11/idUSN11301082 (last visited Apr. 29, 2011).

[8] Available online at http://minnesota.publicradio.org/display/web/2009/02/04/dhs_looking_to_build_better_relationships_with_somali_population/ (last visited Apr. 28, 2011.).

[9] Available online at http://minnesota.publicradio.org/display/web/2009/05/19/yuen_somalis_fbi/ (last visited Apr. 28, 2011).

jury investigation," citing a witness from the Minneapolis Somali community who had been

called to testify before the grand jury.  Laura Yuen, "Grand jury looks into missing Somali men,"

Minnesota Public Radio, Mar. 23, 2009.[10]

On March 27, 2009, only a few days later, NPR reported on a new development in the

grand jury investigation – sealed indictments:

> The FBI has suspects in the case.  A federal grand jury in Minneapolis has
> convened to take a look at the evidence they have collected.  Grand jury
> proceedings are secret and indictments remain sealed until arrests are made.  ***But
> sources told NPR that the grand jury has already brought a handful of
> indictments and more could be added to the current list in the comings days***.

"Somalis Missing From Minn. May Have Returned," National Public Radio Mar. 27, 2009

(emphasis added).[11]  On June 18, 2009, NPR again reported on the existence of sealed grand jury

indictments:  "A Minneapolis grand jury has returned some indictments in the case of the

disappearing youth, but they remain under seal, and the investigation continues."  Dina Temple-

Raston, "Family Mourns After Somali-American Found Dead," National Public Radio, Jun. 18,

2009 (emphasis added).[12]

And even though the original reports of the federal grand jury investigation and the return

of sealed indictments did not contain express confirmations of the investigation by law

enforcement sources, the FBI acknowledged the investigation publicly as part of its outreach

program.  For example, MPR summarized a May 18, 2009 radio interview of Special Agent-in-

---

[10] Available online at
http://minnesota.publicradio.org/display/web/2009/03/22/grand_jury_looks_into_missing_somali_men/ (last visited
Apr. 28, 2011).

[11] Available online at http://www.npr.org/templates/story/story.php?storyId=102416429 (last visited Apr.
28, 2011).

[12] Available online at http://www.npr.org/templates/story/story.php?storyId=105572589 (last visited Apr.
28, 2011).

Charge Ralph Boelter, of the FBI's Minneapolis Field Office, on "Somali Community Link," a

radio show on station KFAI in the Minneapolis area:

> Boelter indicated that the FBI is "getting to that point" in which it will be able to
> go public with its findings, but he didn't specify how much longer it would take.
> A federal grand jury has been meeting for several months about the issue, and
> indictments are expected.

Id.

The net result of this tremendous amount of media coverage and government attention

was that the Somalia-Minneapolis story was well known to the general public, including the

Minneapolis Somali community.

### B.    Mike Levine's Reporting on the Somalia-Minneapolis Story

Like MPR and NPR, Fox News reported on the Somalia-Minneapolis story frequently.

The reporter covering the story for Fox News was Mike Levine, a graduate of the top-ranked

Medill School of Journalism at Northwestern University.  Levine Decl. ¶ 1-3, 5.  Mr. Levine, an

investigative journalist, wrote approximately 34 news reports and blog posts regarding the

Somalia-Minneapolis story.  Id. ¶ 6.  His reporting included (i) overseas developments, *see, e.g.,*

Mike Levine, "American Al Qaeda Hold Rare 'Press Conference'," Fox News, Apr. 6, 2009,[13]

(ii) U.S. developments, *see, e.g.,* Mike Levine, "Missing Somali-American Men Found . . . On

Facebook," Fox News, Mar. 17, 2009,[14] and (iii) the U.S. government's analysis of the overall

problem, *see, e.g.,* Mike Levine, "DHS:  Chances of Home-Grown Attack 'Very Low'," Fox

News, Feb. 23, 2009.[15]

---

[13] Available online at http://www.foxnews.com/story/0,2933,512627,00.html (last visited Apr. 28, 2011).

[14] Available online at http://www.foxnews.com/story/0,2933,509439,00.html (last visited Apr. 28, 2011).

[15] Available online at http://www.foxnews.com/politics/2009/02/23/dhs-chances-home-grown-attack-low/# (last visited Apr. 28, 2011).

5166564

Mr. Levine's reporting on this story shows him to have developed numerous sources within the Minneapolis Somali community, including those directly involved in the grand jury investigation.  *See e.g.,* Mike Levine, "Grand Jury Convenes in FBI Terror Case Against Somali-Americans in Minneapolis, Sources Say," Fox. News, Mar. 10, 2009 ("The FBI has interviewed at least 50 people in the Somali community and subpoenaed at least 10 people to testify before a grand jury in Minneapolis, according to Farhan Hurre, the director of the Abubakar As-Saddique Islamic Center in St. Paul, one of the largest mosques in the Twin Cities. . . . A woman who identified herself as a 20-year-old student at the University of Minnesota said she testified before the grand jury this morning, after receiving a subpoena on Friday. A copy of the subpoena obtained by Fox News says, 'You are hereby commanded to appear and testify before the Grand Jury of the United States District Court'.");[16] Mike Levine, "Source:  'Several' Missing Somali-Americans Back in U.S. After Overseas Terror Mission," Fox News, Mar. 19, 2009 ("In fact, the FBI Field Office in San Diego has already interviewed 'dozens' of people from the Somali-American community there, according to a local attorney.  The lawyer, Mahir Sherif, said he knows many of those who were interviewed . . .");[17] Mike Levine, "Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say," Fox News, Jul 2, 2009 ("Omar Jamal, the executive director of the Somali Justice Advocacy Center in St. Paul, Minn., and another source within the Somali community in Minneapolis identified the man . . . According to Osman Ahmed, whose 17-year-old nephew was one of those to go to Somalia late last year, at least a dozen people have testified before the Minneapolis grand jury . . . In addition, a youth volunteer at the mosque, Abia Ali, recently testified before the grand jury, and she is now

---

[16] Available online at http://www.foxnews.com/story/0,2933,508484,00.html (last visited Apr. 28, 2011).

[17] Available online at http://www.foxnews.com/story/0,2933,509839,00.html (last visited Apr. 28, 2011).

worried that she could face indictment, someone close to Ali told Fox News.");[18] *see also* Levine Decl. ¶ 7.

### C.    Mike Levine's July 2, 2009 News Report

Mr. Levine's reporting on the Somalia-Minneapolis story included a news report on July 2, 2009, which is the subject of these proceedings.[19]  Levine Decl. ¶ 9.  In the July 2 news report, Mr. Levine reported that the grand jury had indicted "a group of Somali-Americans on terror-related charges."  *See* July 2 news report.  He reported that the group included "at least three people."  Id.  In one form or another, Mr. Levine attributed this information to "law enforcement sources."  Id.; *see also* Levine Decl. ¶ 12.  The sources were not further identified in the news report.  Mr. Levine also reported that the "indictments had yet to be unsealed, but [that] an announcement is expected in the next few weeks."  Id.

None of this information was new.  As noted above, NPR had reported the existence of sealed grand jury indictments over three months ***prior*** to Mr. Levine's July 2 news report.[20]  That the indictment's charges were terrorism-related was consistent with the public statements of law enforcement officials about what was occurring within the community, and news reports openly acknowledged that "it's a major violation of U.S. law to join and fight with a terrorist group or to fight against an ally of the U.S."  *See* Laura Yuen & Sasha Aslanian, "Relatives of missing

---

[18] Available online at http://www.foxnews.com/story/0,2933,529796,00.html (last visited Apr. 28, 2011).

[19] The news report was originally posted on FoxNews.com on July 1, 2009, which is the date referenced in the subpoena to Mr. Levine.  The news report was updated on July 2, 2009.  The changes from July 1 to July 2 are not relevant for purposes here, The July 2, 2009 version is the one most readily available online.  *See* Mike Levine, "Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say," Jul. 2, 2009, available online at http://www.foxnews.com/story/0,2933,529796,00.html (last visited Apr. 28, 2011) [hereinafter, the "July 2 news report"].  A copy of the July 2 news report is attached as **Exhibit A** to Mr. Levine's Under Seal Motion to Quash Grand Jury Subpoena, which is filed simultaneously herewith.

[20] We do not know if, like Mr. Levine, NPR or its reporter received a subpoena in this matter.

8

Somali men use homeland ties in search," Minnesota Public Radio, Mar. 30, 2009.[21]  And that an announcement of the indictments was imminent was consistent with the statement from the FBI SAC in Minneapolis, noted above, that "the FBI is 'getting to that point' in which it will be able to go public with its findings."

Significantly, what was new in Mr. Levine's July 2 news report was the identity of one of the individuals who had been charged – a man named "Abdifatah Ise (sic)."  However, as the July 2 news report makes clear, Isse's[22] identity was actually revealed to Mr. Levine by individuals from the Somali-American community in Minneapolis, not by law enforcement sources:

> Omar Jamal, the executive director of the Somali Justice Advocacy Center in St. Paul, Minn., and another source within the Somali community in Minneapolis identified the man as 21-year-old Abdifatah Ise. Jamal said Ise's family contacted him for "assistance" after the arrest, but he had been unable to speak publicly about it until now "in the interest of" a federal investigation.

July 2 news report; *see also* Levine Decl. ¶ 11.

### D. The Somali Defendants

#### 1. Kamal Said Hassan

On February 11, 2009, Kamal Said Hassan was charged in a sealed information on terrorism-related charges.[23]  *See* United States v. Hassan, Case No. 0:09-cr-00038-MJD, D. Minn. [DE #1].  One week later, on February 18, defendant Hassan pleaded guilty.  Thus, by the time of the July 2 news report, his guilty plea was 4 ½ months old.  Mr. Levine's July 2 news report did not refer to defendant Hassan.

---

[21] Available online at http://minnesota.publicradio.org/display/web/2009/03/30/somali_search/ (last visited Apr. 29, 2011).

[22] In the July 2 news report, Isse had been misspelled as "Ise."

[23] A false statement count was later added in a supplemental information.

9

### 2.     Abdifatah Yusuf Isse

On February 19, 2009 defendants Abdifatah Yusuf Isse and Salah Osman Ahmed were charged in a sealed indictment on terrorism-related charges.  *See* United States v. Isse, Case No. 0:09-cr-000501-MJD, D. Minn. [DE #1].  On February 24, only five days later, defendant Isse was arrested and was remanded into custody.  On March 4, less than two weeks later, Isse pleaded guilty.  Thus, by the time of the July 2 news report, defendant Isse had already pleaded guilty and had been in custody for approximately four months.

### 3.     Salah Osman Ahmed

On July 11, 2009, two days prior to the unsealing of the Isse-Ahmed indictment, a detailed account of the Somalia-Minneapolis story was published online by The New York Times.  *See* Andrea Elliott, "A Call to Jihad, Answered in America," New York Times, Jul. 11, 2009.[24]  This story was accompanied by a graphic listing a number of Somali-Americans from the Minneapolis area who had traveled overseas to enlist in al-Shabaab, and who had then decided to return home to America.  One of the men listed on the graphic was Salah Osman Ahmed, the defendant originally indicted with defendant Isse in February 2009.[25]

On July 11, 2009 – the same day as the publication of The New York Times story online – defendant Ahmed was arrested and remanded into custody.[26]  On July 13, 2009 – the day after the publication of The New York Times story in print – the indictment charging defendants Isse

---

[24] Available online at http://www.nytimes.com/2009/07/12/us/12somalis.html?pagewanted=all (last visited Apr. 28, 2011).  Our understanding is that this article, and the accompanying graphic, were published online on July 11, 2009, and then published in print on July 12, 2009.

[25] The graphic accompanying The New York Times story also includes the names of other Somali-American men who were indicted subsequent to publication of the story.  We do not know if, like Mr. Levine, The New York Times or its reporter received a subpoena in this matter.

[26] Even though this coincidence in dates is striking, it appears from reviewing the docket sheet that plans to arrest defendant Ahmed were being made prior to July 11, as CJA counsel was arranged for him on July 10, 2009. United States v. Isse, Case No. 0:09-cr-000501-MJD, D. Minn. [DE #35].

and Ahmed was unsealed.  *See* United States v. Isse, Case No. 0:09-cr-000501-MJD, D. Minn.

[DE #25]; Mike Levine, "Feds:  They Wanted to Fight Jihad in Somalia," Fox News Live Shots

Blog, Jul. 13, 2009.[27]  Ahmed pleaded guilty two weeks later on July 28.

Mr. Levine's July 2 news report did not refer to defendant Ahmed.

### 4.      The defendants' release from custody by the district court

At first blush, the terrorism-related charges that were brought against the Somali

defendants appear to suggest that these defendants would be flight risks and dangers to their

local community.  However, in the months that followed, actions by the district court in

Minnesota seem to undercut this.  For instance, both Isse and Ahmed were eventually released

from custody by the district court in January 2010 and March 2010, respectively.  In addition,

although as a condition of their release the defendants were initially required to reside in a

halfway house and were required to be subject to electronic monitoring, these conditions were

eventually removed.

---

[27] Available online at http://liveshots.blogs.foxnews.com/2009/07/13/feds-they-wanted-to-fight-jihad-in-somalia/# (last visited Apr. 28, 2011).

5166564

### E.        The Subpoena to Mike Levine

On or about January 24, 2011, approximately 18 months after the July 2 news report, Mr.

Levine received the instant subpoena.[28]  Levine Decl. ¶ 1.  The subpoena calls for Mr. Levine to

testify before the grand jury, as well as to produce documents related to the July 2 news report.

Based on the plain language of the subpoena, as well as discussions among counsel, we

understand the government to be seeking the identity of the "law enforcement sources" cited in

Mr. Levine's July 2 news report in connection with an investigation into possible violations of

Fed. R. Crim. P. 6(e).

Prior to Mr. Levine's receipt of the subpoena, he received a call from a Department of

Justice Office of Inspector General agent working on the government's instant investigation.

Levine Decl. ¶ 18.  Mr. Levine referred the agent to in-house counsel at Fox News.  Id.  The

government did not discuss this matter further with Mr. Levine prior to issuance of the subpoena.

Id.

After receipt of the subpoena, outside counsel was retained for Fox News and individual

counsel was retained for Mr. Levine, and they together began a dialogue with the government.

Counsel were aware of the Department's internal guidelines regarding the issuance of subpoenas

to members of the news media, which require the Department to negotiate with the member of

the news media prior to the issuance of a subpoena.  *See* 28 C.F.R. § 50.10(c).

On April 13, 2011, multiple meetings and calls among counsel for Mr. Levine, counsel

for Fox News, and counsel for the government culminated in a voluntary meeting with the

government at which Mr. Levine answered certain questions.  Mr. Levine answered the

---

[28] A copy of the subpoena is attached as **Exhibit B** to Mr. Levine's Under Seal Motion to Quash Grand
Jury Subpoena, which is filed simultaneously herewith.  The subpoena was actually sent to Mr. Levine's employer,
Fox News, but Mr. Levine is not contesting the government's service of the subpoena.

prosecution team's questions about his personal background and his employment history with Fox News.  Mr. Levine explained that he became involved in the Somalia-Minneapolis story initially by asking the Secretary of the Department of Homeland Security a question at an event not long after she was sworn into office in 2009.  Levine Decl. ¶ 5.  Regarding the July 2 news report specifically, Mr. Levine explained that his original source for the July 2 story was not a law enforcement source at all, but rather was Omar Jamal, a well-known Somali activist in Minneapolis who was quoted and cited to in the July 2 news report itself.  Id. ¶ 11.

Regarding the references to law enforcement sources in the July 2 news report, Mr. Levine candidly said that he could not recall the names of the "law enforcement sources" referenced in the July 2 news report who he believed confirmed the information from Mr. Jamal. Id. ¶ 13.  This should not be surprising.  Mr. Levine wrote 34 news reports and blog posts on the Somalia-Minneapolis story.  Id. ¶ 6.  Approximately 22 months have passed since Mr. Levine wrote the July 2 news report, in which time he has written approximately 180 other news reports and blog posts on all manner of stories.  Id.  He had multiple law enforcement sources for the Somalia-Minneapolis story, and has contacted certain of those sources for different stories since that time.  Id. ¶ 13.  Thus, even if he were inclined to do so, Mr. Levine would not be capable of providing the government with the identities of the "law enforcement sources" referenced in the July 2 news report.  Id. ¶¶ 13-14.

However, Mr. Levine explained that, from his universe of sources on the Somalia-Minneapolis story, he was able to narrow down to a list of five names those most likely to have been the "law enforcement sources" referenced in the July 2 news report.  Id. ¶ 15.  Mr. Levine also explained that this list of five names was over-inclusive, in that the "law enforcement sources" that were referenced in the July 2 news report did not add up to five different

13

individuals.  Id.  As a result, requiring Mr. Levine to reveal all five names necessarily requires

Mr. Levine to reveal to the government the names of confidential sources who are not the targets

of the government's investigation.  Id.  Mr. Levine declined to reveal those five names.

Mr. Levine nevertheless continued to answer the government's other questions.  For

instance, Mr. Levine explained that his sources were federal law enforcement sources, not state

or local.  He explained that he generally defined the term "law enforcement source" to include

agents, prosecutors, and public information officers, but not intelligence sources.  He

acknowledged that he spoke with individuals from both the U.S. Department of Justice and the

U.S. Department of Homeland Security, and that they were from both Washington, D.C. and

Minnesota.  Id. ¶ 7.  Mr. Levine explained that he spoke with his sources in person, by e-mail,

and frequently by phone, id., and he provided the prosecution team with his work phone number,

his work cell number, and his personal cell number.  In short, although Mr. Levine did not

provide the government with a list of the names of the five potential law enforcement sources, he

provided the government with a substantial amount of information.

Moreover, Mr. Levine took the additional extraordinary step of discussing with the

government the nature of his conversations with the "law enforcement sources" for the July 2

news report.  Just as he was unable to remember the names of the specific law enforcement

sources for the July 2 news report, Mr. Levine was unable to remember the specific

conversations he had with those sources.  Id. ¶ 16.  However, Mr. Levine explained to the

government what he believed the nature of those conversations were likely to have been.  Mr.

Levine explained that his conversations would have been for the purpose of obtaining

confirmation of what had been previously reported on this Somalia-Minneapolis story, as well as

to get confirmation of information Mr. Levine obtained from Mr. Jamal.  Id. ¶¶ 8, 17.  Mr.

Levine explained how he defined different types of attribution, including "on the record," "background," "deep background," and "off the record." Id. ¶ 4.  Mr. Levine also explained that in those instances where sources declined to discuss a subject with him, he would have employed the investigative reporting technique of getting confirmation of information based not merely on what his sources said (or refused to say) in response to his questions, but also how they said what they said, including any changes in the source's mood, tone, volume or pitch of voice.  Id. ¶ 17. Mr. Levine explained that his sources likely ended their conversations believing that they had been in compliance with Rule 6(e), even though Mr. Levine ended their conversations having gotten the confirmation he needed for the July 2 news report.[29]  Id.

During the meeting, the government asked certain questions about Mr. Levine's willingness to answer additional questions.  Mr. Levine did not rule out that possibility, and specifically requested that the prosecution team discuss those matters with his counsel.

On Tuesday, April 19, the government informed counsel that it did not believe further discussions would be productive, and that, by its calculation, it had no choice but to litigate enforcement of the subpoena.  Counsel for Mr. Levine attempted to appeal this decision internally with the Department of Justice, and sought meetings with offices of the Assistant Attorney General for the Criminal Division and, subsequently, the Attorney General.  Neither the Assistant Attorney General nor the Attorney General agreed to a meeting.

---

[29] To the extent that the July 2 news report uses words like "told" and "said" to refer to the law enforcement sources, Mr. Levine conceded that in hindsight those were probably not the right words to use.  Mr. Levine explained that if he were to write the story over, he would use a word such as "indicated."  Id. ¶ 17.

## ARGUMENT

**A.    The Subpoena Should Be Quashed Because It Is Unreasonable and Oppressive Under Rule 17(c).**

### 1.    The Legal Standard

"The court may quash or modify [a] subpoena if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  "Rule 17(c)(2) requires a discretionary, case-by-case inquiry."  <u>United States v. Bergeson</u>, 425 F.3d 1221, 1222 (9th Cir. 2005).  "There is no rule that without some particular factor, the government cannot have the subpoena, or that with it, it can. The factors the district court must consider under Rule 17(c)(2) – unreasonableness and oppressiveness – cannot sensibly be converted into a mechanical rule enabling an escape from case-by-case judgment."  <u>Id.</u> at 1222-23; *see also* <u>United States v. R. Enterprises, Inc.</u>, 498 U.S. 292, 299 (1991) ("[W]hat is reasonable [under Rule 17(c)(2)] depends on the context.").

The Ninth Circuit's opinion in <u>United States v. Bergeson</u> is on point here.  <u>Bergeson</u> arose out of a grand jury's investigation into "bail jumping" by a defendant.  *See* <u>Bergeson</u>, 425 F.3d at 1222-23.  In connection with that investigation, a grand jury subpoena was issued to the defendant's attorney seeking testimony regarding the attorney's communications with the defendant about the date he was supposed to appear in court.  <u>Id.</u> at 1223.  The district court found that the communications sought by the subpoena were not protected by the attorney-client privilege.  <u>Id.</u> at 1225.  Nevertheless, the district court quashed the subpoena.  The district court accepted the attorney's representation, based on the applicable rules of professional  conduct, that testifying in the grand jury would result in the destruction of her attorney-client relationship with the defendant.  <u>Id.</u> at 1226.  In quashing the subpoena, the district court noted that its decision was "on a policy basis in accordance with the U.S. Attorney guidelines," which require Justice Department attorneys to attempt to obtain information from non-attorney sources, and

16

caution that "[t]he need for the information … must outweigh the potential adverse effects on the attorney-client relationship."  Id. at 1223 (*citing* United States Attorneys' Manual §§ 9-13.410(B) & (C)).  The district court found that the government had other ways to procure an indictment "if that, in fact, is what [the government] was seeking to do."  Id. at 1223.

On appeal, the Ninth Circuit affirmed the district court's order quashing the subpoena.

As it explained:

> There were good reasons for the district court's exercise of discretion [to quash the subpoena].  A client's confidence in his lawyer, and continuity of the attorney-client relationship, are critical to our system of justice.  The Justice Department restraints on issuing subpoenas to lawyers . . . that the district court cited in this case are instructive on this point.  Though these Justice Department directives are directions by an employer to its employees and not law, they demonstrate the recognition that the government has given to this fundamental interest.  Issuing subpoenas to lawyers to compel them to testify against their clients invites all sorts of abuse.

> * * *

> We do not suggest that a subpoena of a lawyer to testify against her clients before a grand jury would always be unreasonable or oppressive.  The circumstances, such as the risk of imminent physical harm to others, magnitude of the case, scarcity of evidence – all sorts of things that bear on reasonableness – can legitimately be weighed along with the potential harm from enforcing the subpoena.  But in this case, the district court's exercise of its discretion to quash the subpoena was eminently reasonable.

Id. at 1226-1227.

Thus, as Bergeson makes clear, the inquiry under Rule 17(c) is case specific, and requires a balance of interests implicated by the facts of the particular case.

### 2.      The Department of Justice Guidelines for Subpoenas to Members of the News Media

As with subpoenas to attorneys discussed in Bergeson, the Department of Justice has guidelines governing the issuance of subpoenas to members of the news media.  *See* 28 C.F.R. § 50.10; United States Attorneys' Manual § 9-13.400.  Like the guidelines discussed in Bergeson,

17

Mr. Levine recognizes that these guidelines do not create an enforceable right.  *See* <u>In re Grand Jury Subpoena, Judith Miller</u>, 438 F.3d 1141, 1152 (D.C. Cir. 2006).

However, as with the fundamental interest that exists between attorneys and their clients, the Department's guidelines governing the issuance of subpoenas to members of the news media demonstrate the fundamental interest our society has in a free press, and the need to insure that this fundamental interest is not unduly infringed upon.  As the Department of Justice guidelines state:

> Because freedom of the press can be no broader than the freedom of reporters to investigate and report the news, ***the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues***. This policy statement is thus intended to provide protection for the news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function.

28 C.F.R. § 50.10 (emphasis added).  The guidelines make clear that the government's investigatory interest is not paramount, but rather must be balanced against the public's interest in a free press.  <u>Id.</u> § 50.10(a) ("In determining whether to request issuance of a subpoena to a member of the news media, or for telephone toll records of any member of the news media, the approach in every case must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice.")

In order to ensure that the policy reflected in the guidelines is actually carried out, the guidelines impose on Department prosecutors certain procedural requirements.  The first requirement is that the subpoenas to members of the news media be an investigatory refuge of last resort.  <u>Id.</u> § 50.10(b) ("All reasonable attempts should be made to obtain information from alternative sources before considering issuing a subpoena to a member of the news media, and

18

similarly all reasonable alternative investigative steps should be taken before considering issuing a subpoena for telephone toll records of any member of the news media.").

The second requirement is that Department prosecutors negotiate with the members of the news media, and that such negotiations take place ***prior to*** the issuance of the subpoena.  Id. § 50.10(c) ("Negotiations with the media shall be pursued in all cases in which a subpoena to a member of the news media is contemplated.").  This timing requirement is significant, in that it is during this time that the opportunity for productive dialogue is greatest.  For instance, at this time on the reporter's side, there is no pending threat or fear of contempt, nor is there a pending return date that can unnecessarily accelerate the negotiations.  Similarly, on the Department's side, because no subpoena has yet been issued, the Attorney General has not yet committed himself to a particular course of action.

The third requirement is that, during the negotiations, the Department must recognize and attempt to accommodate the particular interests and problems of the media.  Id. § 50.10(c) ("These negotiations should attempt to accommodate the interests of the trial or grand jury with the interests of the media. Where the nature of the investigation permits, the government should make clear what its needs are in a particular case as well as its willingness to respond to particular problems of the media.").

The fourth requirement is that there must "be reasonable grounds to believe, based on information obtained from non-media sources, that a crime has occurred, and that the information sought is essential to a successful investigation--particularly with reference to directly establishing guilt or innocence."  Id. § 50.10(f)(1).  Further, the subpoena should be narrowly tailored, and "should not be used to obtain peripheral, nonessential, or speculative information."  Id.

Finally, the subpoena must be approved by the Attorney General.  <u>Id.</u> § 50.10(e)

### 3. The Subpoena To Michael Levine Should Be Quashed.

Like the district court did in <u>Bergeson</u>, this Court should quash the subpoena to Mr.

Levine as both oppressive and unreasonable.

### a. The Government's Interest In This Matter is Minimal.

#### i. The information attributable to "law enforcement sources" was already public knowledge.

The government's interest in this investigation is minimal.  As an initial matter, and as

the discussion above regarding the amount of public statements and public reporting shows, the

alleged leak of the "news" to Mr. Levine being investigated by the Department and attributed to

"law enforcement sources" in the July 2 news report wasn't "news" at all.  Law enforcement's

investigative interest in the Minneapolis Somali community, and their concerns about members

of the community supporting terrorism, was public knowledge for months prior to the July 2

news report.  The FBI Director spoke about it.  High ranking law enforcement officials in

Washington testified before Congress about it.  Local members of the Somali community, who

were actually subpoenaed to testify before the grand jury, spoke to the press and complained

about it.  The fact of the grand jury investigation and sealed indictments had been reported on

multiple times by other news outlets in the weeks and months prior to Mr. Levine's July 2 news

report, as had the fact that the FBI would soon be reaching a point where it would be able to go

public with the findings of its investigation.

#### ii. The justifications for Rule 6(e) do not apply to the information sought in the subpoena in this case.

The Supreme Court has listed five justifications for grand jury secrecy, as embodied in

Fed. R. Crim. P. 6(e):  (1) to prevent the escape of those whose indictment may be contemplated;

(2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; and (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt. *See* Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 219 n.10 (1979).

None of these justifications are implicated in this case.  As discussed above, the only defendant named in Mr. Levine's July 2 news report – Isse – was already in custody and had pleaded guilty as of July 2, and the sources for Isse's name in the story were members of the Minneapolis Somali community, not a law enforcement source.  To the extent there was any risk of flight, it was only as to defendant Ahmed, and he wasn't even named in Mr. Levine's July 2 news report.  And in any event, defendant Ahmed did not in fact flee.  He was arrested nine days later, was remanded, and pleaded guilty shortly thereafter.

As the D.C. circuit has held, grand jury secrecy should only be maintained as long as necessary, and it is no longer necessary when the "contents of grand jury matters have become public."  In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1138, 1140 (D.C. Cir. 2006).  In fact, even where there is an actual revelation by a person covered by Rule 6(e) of a witness's identity, which is not the case here, there is no Rule 6(e) implication where the grand jury matters were already public.  *See* In re Sealed Case, 192 F.3d 995, 1004-5 (D.C. Cir. 1999).

### iii. The confirmations from law enforcement sources in the July 2 news report resulted from good journalistic technique, not leaks.

Finally, as a result of Mr. Levine's extraordinary willingness to speak with the government – voluntarily – about this matter, the government knows that Mr. Levine obtained confirmation for his July 2 news report through good investigative reporting technique, not through indiscriminate leaks.  Levine Decl. ¶ 17.  As Mr. Levine explained, he likely obtained these confirmations by how his sources answered (or did not answer) his questions, such that after the conversation the sources – truthfully – believed that they had maintained their purported 6(e) obligation.  Id.

### b. Mr. Levine's Interest In This Matter Is Substantial.

In stark contrast to the government interest in this matter, Mr. Levine's interest is substantial.  As discussed above, Mr. Levine does not recall the names of the "law enforcement sources" referenced in the July 2 news report.  Levine Decl. ¶ 13.  Although he is able to narrow these sources down to a list of five possibilities, requiring Mr. Levine to disclose all five names would necessarily require him to reveal the names of confidential sources who are not even targets of the government's investigation.  Id. ¶ 15.  It is a heavy enough, and in our view unconstitutional, burden to require a reporter to reveal the name of any of his confidential sources, even if the source is under investigation.  Regardless of the constitutional question, it is certainly an even more onerous burden to require a reporter to reveal the names of sources who are ***not*** under investigation.

The Department's guidelines do not contemplate this type of wholesale disclosure.  Rather, the guidelines require that subpoenas to the media be narrowly tailored.  28 C.F.R. § 50.10(f)(1).  In fact, requiring Mr. Levine to reveal his entire list of five possibilities in order to

22

get at the names the government is actually interested in is, to borrow a phrase from a civil

discovery case, not merely a fishing expedition but rather is "an effort to drain the pond and

collect the fish from bottom."  In re IBM Peripheral EDP Devices Antitrust Litigation, 77 F.R.D.

39, 42 (N.D. Cal. 1977).  Nor does the government's attempt to require such wholesale

disclosure show any respect for the particular problem of the news media presented by these

facts, as is required under the Department's guidelines.  28 C.F.R. § 50.10(c).

Finally, there would be significant consequences to Mr. Levine in his professional

capacity, and to the media generally, were this Court to require disclosure under these

circumstances.  As he explains in his declaration, Mr. Levine routinely has sources with whom

he agrees not to disclose their names, or other information provided to him in confidence.

Levine Decl. ¶¶ 4, 19-21.  Just based on a review of his e-mails from the past few weeks, Mr.

Levine located more than 25 e-mails where a source offered to provide him with information

"off the record" or "on background."  Id. ¶ 19.  It is not uncommon for a source to insist, as a

condition of his or her providing information to him, that Mr. Levine agree to keep the source's

name, and/or the information, confidential.  Id.  Mr. Levine has had a source condition the

source's entire relationship with Mr. Levine on the agreement that everything would be on

background.  Id.  These specific, real-world examples from Mr. Levine's professional career

plainly show that his ability to report on matters of public concern would be significantly

impaired were he required to disclose the names of his law enforcement sources.  Not only

would it undermine his relationships with current sources, but it would prevent him from

developing new sources in the future.  Id. ¶ 20.

This is particularly true given that, on these facts, Mr. Levine would be revealing the

names of sources that are not even under investigation by the government.  Id. ¶ 21.  Disclosing

those names would destroy his relationship with those sources.  Id.  There is no justification for Mr. Levine to reveal the names of sources not under investigation by the government, and were he ordered to betray that trust, he would not be able to regain it and use them again as confidential sources.  Id.[30]

Mr. Levine's sources trust him because they have seen his work, understand that he reports on matters of public concern, and keeps his word regarding confidentiality.  Id. ¶ 20. Revealing the names of his law enforcement sources, as the government wants him to do in this case, would undermine those relationships and betray that trust.  Therefore, the balance of interests here clearly shows that the subpoena requiring Mr. Levine to reveal the names of his confidential law enforcement sources is unreasonable and oppressive, and should be quashed pursuant to Fed. R. Crim. P. 17(c).[31]

As one district court concluded recently, under analogous[32] circumstances:

Although every 6(e) violation is a serious matter, the 6(e) violation here did not interfere with the functioning of the grand jury or, in my judgment, cause harm to anyone.  Mr. Mak and the other defendants all had their guilt determined in a fair and just manner. None of them suffered undue embarrassment from the grand jury

---

[30] At least two cases in this Circuit have involved reporters who were unable to remember the names of the sources whose identities were sought.  See Lee v. Department of Justice, 413 F.3d 53 (D.C. Cir. 2005); Hatfill v. Mukasey, Civil Action No. 03-1793 (RBW), D.D.C.  The courts' consideration of this fact, however, was in a different context, specifically whether the reporter should be held in contempt and what effect, if any, the reporter's lack of recollection had on the appropriateness of the contempt finding in light of the wording of the particular order compelling disclosure in those cases.

[31] As noted above, we submit that Fed. R. Crim. P. 17(c) provides the Court with an independent basis to quash the subpoena.  Notwithstanding, it is also the case that "a subpoena may be quashed if it cannot withstand constitutional scrutiny."  In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq., 706 F.Supp.2d 11, 14 (D. D.C. 2009) (citing U.S. v. R. Enters., 498 U.S. at 299; In re Grand Jury, John Doe No. G.J. 2005-2, 478 F.3d 581, 585 (4th Cir. 2007)).  As described below, the subpoena infringes upon Mr. Levine's first amendment rights, and he hereby preserves the argument that the subpoena must be quashed under Fed. R. Crim. P. 17(c) on that basis as well.  See id. (citing In re Grand Jury, John Doe No. G.J. 2005-2, 478 F.3d at 585 for the proposition that "Rule 17(c) offers a vehicle for a subpoenaed party to assert a constitutional challenge").

[32] In Chi Mak, the district court, post-trial, was conducting its own investigation of a possible Rule 6(e) violation.  Although the circumstances there are not identical to those here involving a grand jury subpoena to Mr. Levine, they are more like a grand jury investigation than they are like a subpoena to a reporter for documents or testimony in connection with a civil or criminal trial.

24

leak since they already had been indicted on similar charges. The safety of a
witness or a defendant was never threatened, nor was the flight of a witness or a
defendant ever a concern.  In contrast, the freedom of the press is of paramount
interest. The public depends on reporters …to uncover government misconduct
and to inform us about the important issues that confront the nation. As Thomas
Jefferson so aptly stated over 200 years ago, "our liberty cannot be guarded but by
the freedom of the press, nor that be limited without danger of losing it."

United States v. Chi Mak, 8:05-cr-00293-CJC, Doc. 766, Tr. at 43 (C.D. Cal. July 24, 2008).

**B.      The Subpoena Should Be Quashed Because It Seeks Information Protected
From Disclosure by the Reporter's Common Law Privilege.**

In this Circuit, the leading case on the existence of a common law reporter's privilege in

the context of a grand jury subpoena is In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141

(D.C. Cir. 2006).  In Miller, the D.C. Circuit was "not of one mind" on whether a common law

reporter's privilege should be found to exist,[33] and as a result left that question open in its

opinion.  Id. at 1150 (finding, however, "for the reasons set forth in the separate opinion of Judge

Tatel," that if such a qualified privilege did exist, it was overcome in that particular case).  This

Court should find that a federal common law reporter's privilege does exist, and that, on these

facts, such a privilege requires the instant subpoena to be quashed.

---

[33] Only one member of the panel, however, was prepared to hold that no common law reporter's privilege
exists.  See Miller, 438 F.3d at 1150 ("Judge Sentelle would hold that there is no such common law privilege for
reasons set forth in a separate opinion.  Judge Tatel would hold that there is such a common law privilege.  Judge
Henderson believes that we need not, and therefore should not, reach that question.").

1.     **The Legal Standard for Recognition of Common Law Privileges**

In the federal courts today, privileges are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."  Fed. R. Evid. 501.  As the words "reason and experience" plainly suggest, these principles evolve over time.  *See* United States v. Weber Aircraft Corp., 465 U.S. 792, 803 n.25 (1984) ("Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them."); Trammel v. United States, 445 U.S. 40, 47 (1980) ("In . . . enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege.  Its purpose, rather, was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis, and to leave the door open to change.") (internal citations omitted).

Consistent with this evolution, since 1975 the Supreme Court has recognized multiple privileges under Fed. R. Evid. 501.  *See, e.g.,* Jaffee v. Redmond, 518 U.S. 1, 15 (1996) (psychotherapist-patient privilege); Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (corporate attorney-client privilege); Trammel, 445 U.S. at 51 (marital communications privilege).

To guard against federal courts improvidently recognizing new privileges, the Supreme Court in Jaffee identified four factors to consider in recognizing a new privilege:  (1) whether the privilege is rooted in the imperative need for confidence and trust; (2) whether the privilege would serve public ends; (3) the evidentiary benefit that would arise from denying the privilege; and (4) the states' rules on the matter.  518 U.S. at 10-15.

## 2.     This Court Should Recognize a Common Law Reporter's Privilege.

Judge Tatel's concurrence in <u>Miller</u> contains an exhaustive and persuasive discussion of the <u>Jaffee</u> factors in the context of a common law reporter's privilege, and each factor is satisfied here.  It is inarguable that the reporter's privilege is rooted in the imperative need for confidence and trust, and that it serves the public's interest.  The Supreme Court has clearly stated the important role played by the press in our society.  "The press, shielded by the First Amendment, has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees, and generally informing the citizenry of public events and occurrences." <u>Estes v. Texas</u>, 381 U.S. 532, 539 (1965).  Indeed, "the First Amendment's express protection for 'freedom . . . of the press' forecloses any debate about that institution's 'important role in the discussion of public affairs'." <u>Miller</u>, 438 F.3d at 1168 (*citing* <u>Mills v. Alabama</u>, 384 U.S. 214, 219 (1966)) (Tatel, J., concurring).

Not only is the press important generally, but the need to maintain confidentiality is crucial for the press to play this important role in our society.  In a different context, the D.C. Circuit has acknowledged that there are "obvious First Amendment problems" with "[c]ompelling a reporter to disclose the identity of a confidential source." <u>Zerilli v. Smith</u>, 656 F.2d 705, 710 (1981).  That court has also acknowledged that "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability and weaken a vital source of information, leaving citizens far less able to make informed political, social, and economic choices." <u>Miller</u>, 438 F.3d at 1169 (*citing* <u>Zerilli</u>, 676 F.2d at 711) (Tatel, J., concurring).

In the context of a grand jury subpoena, as in this case, Judge Tatel explained that the same problems exist:

5166564

If litigants and investigators could easily discover journalists' sources, the press's truth-seeking function would be severely impaired. Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds; they could report arrest statistics, but not garner first-hand information about the criminal underworld. Such valuable endeavors would be all but impossible, for just as mental patients who fear embarrassment or disgrace will surely be chilled in seeking therapy, so will sources who fear identification avoid revealing information that could get them into trouble.

Id. at 1168 (citations and internal quotation marks omitted) (Tatel, J., concurring). Also informative on this point are the Department's own guidelines. *See* 28 C.F.R. § 50.10. As acknowledged above, these guidelines do not have the force of law and do not create in Mr. Levine any substantive rights. However, they do reflect Department of Justice policy that "the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues." Id.

The need for confidentiality is not just theoretical. As explained above, reporters like Mr. Levine depend on confidential sources to do their jobs. Levine Decl. ¶ 4, 19-21. Similarly, sources rely on the guarantee of confidentiality in deciding whether to reveal information in the first place. Id. The expectation that members of the press will maintain confidentiality and report information only on background is so prevalent in our society that even the government – officially – relies on such guarantees in the dissemination of important information to the public. *See, e.g.,* "Background Briefing by Senior Administration Officials on Al Shabaab Terrorist Organization," The White House, Jul. 14, 2010 ("As we mentioned, we're doing a call on background with senior administration officials on the Al Shabaab terrorist group. I'm going to turn it over to our senior administration official number one to make some introductory remarks.

And then we'll open it up for your questions.");[34] "Background Briefing By Senior Administration Officials On Iranian Nuclear Facility," The White House, Sept. 25, 2009 ("Just to go quickly through the rules as we get started here, if everybody is ready to go.  We're doing this obviously off camera and on background as senior administration officials.");[35] "Briefing on Steinberg's Travel to Greece, Burns' Travel to Italy," U.S. Department of State, Jun. 24, 2009 (explaining in response to question of why briefing is on background that "we want to give the Senior Administration Official a chance to speak very openly and talk about some details of the itinerary that we really don't want to be on the record.").[36]

Because of the "chilling effects" discussed here, much of the information that is sought by subpoenas from reporters would never even exist absent the reporter's ability to use confidential sources.  "Consequently, as with other privileges, the likely evidentiary benefit that would result from the denial of the [reporter's] privilege is modest."  Id. (Tatel, J., concurring). On the other hand, "the public harm that would flow from undermining all source relationships would be immense."  Id. (Tatel, J., concurring); see also Levine Decl. ¶ 19 ("It is not uncommon for a source to insist, as a condition his of her providing information to me, that I agree to keep his or her name, and/or the information, confidential.").

Finally, there is no room for doubt about where the states stand with respect to the recognition of a reporter's privilege – forty-nine states plus the District of Columbia offer some form of qualified protection to a reporter's sources.  Id. at 1170 (Tatel, J., concurring).  As Judge

---

[34] Available online at http://www.whitehouse.gov/the-press-office/background-briefing-senior-administration-officials-al-shabaab-terrorist-organizati (last visited on Apr. 28, 2011).

[35] Available online at http://www.whitehouse.gov/the-press-office/background-briefing-senior-administration-officials-iranian-nuclear-facility (last visited on Apr. 28, 2011).

[36] Available online at http://www.america.gov/st/texttrans-english/2009/June/20090624110103emffen0.5105707.html (last visited on Apr. 28, 2011).

Tatel points out, "[d]enial of the federal privilege . . . would frustrate the purposes of the state legislation by exposing confidences protected under state law to discovery in federal courts." Id. (*citing* Jaffee, 518 U.S. at 13) (Tatel, J., concurring).

Thus, each of the Jaffee factors is satisfied, and each supports the recognition of a reporter's privilege in this case.  As Judge Tatel eloquently summed up the matter:

> "Reason and experience," as evidenced by the laws of the forty-nine states and the District of Columbia, as well as the federal courts and the federal government, support recognition of a privilege for reporters' confidential sources.  To disregard this modern consensus in favor of decades-old views . . . would not only imperil vital news gathering, but also shirk the common law function assigned by Rule 501 and "freeze the law of privilege," contrary to Congress' wishes.

Id. at 1172 (*citing* Trammel, 445 U.S. at 47) (Tatel, J., concurring).

Judge Tatel's analysis of the Jaffee factors, and his conclusion that they support the recognition of a federal common law reporter's privilege, is hardly surprising given other case law in this Circuit, which has found the existence of such a privilege in other contexts.  For example, in United States v. Ahn, 231 F.3d 26 (D.C. Cir. 2000), *cert. denied sub nom.*, Ahn v. United States, 532 U.S. 924 (2001), a criminal case not involving a grand jury, the Court affirmed the grant of a reporter's motion to quash a subpoena that would have required the reporter to reveal his source through testimony deemed neither essential nor relevant to a determination of guilt or innocence.  D.C. District Courts have taken a similar approach to the common-law-reporter's privilege issue.  *See*, *e.g.*, U.S. C.F.T.C. v. McGraw-Hill Companies, Inc., 507 F. Supp.2d 45, 51 (D.D.C. 2007) (holding in the context of an administrative enforcement action that "[i]n this Circuit, the [reporter's] privilege applies to civil as well as criminal actions . . ."); United States v. Hubbard, 493 F. Supp. 202, 205 (D.D.C. 1979) (quashing subpoena from criminal defendant to reporter on ground of "newsman's privilege" because

5166564

alternative means of obtaining the information existed and the "testimony of the reporter would be far less than necessary to a fair resolution of th[e] case").

Moreover, the D.C. Circuit is not alone in its application of a balancing test in applying a common law reporter's privilege in criminal cases.  The Third Circuit long ago recognized common law protection for reporters in criminal cases.  *See, e.g.,* United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir 1980) (citing to its earlier holding that "journalists possess a qualified privilege not to divulge confidential sources and not to disclose unpublished information in their possession in criminal cases.").

In addition, the Second Circuit followed the D.C. Circuit in applying the test to determine whether a qualified reporter's privilege would be overcome by the facts of that case, but did not rule on the existence of a qualified privilege.  *See* New York Times Co. v. Gonzales, 459 F.3d 160, 169 (2d Cir. 2006).  As in Miller, the Second Circuit applied the common law privilege test without formally recognizing it.  And, as in Miller, the Court's opinion was accompanied by at least one judge's strong support for explicit recognition of a common law reporter's privilege.  In his dissent, Judge Sack emphatically found the existence of a common-law reporter's privilege, holding as follows:

> A qualified journalists' privilege seems to me easily — even obviously — to meet each of th[e] qualifications [outlined by the Supreme Court for determining whether a privilege exists]. The protection exists. It is palpable; it is ubiquitous; it is widely relied upon; it is an integral part of the way in which the American public is kept informed and therefore of the American democratic process.

New York Times Co. v. Gonzales, 459 F.3d at 181 (Sack, J., dissenting).

**3.    A Balance of Interests Requires That The Subpoena Be Quashed On These Facts.**

In <u>Miller</u>, Judge Tatel did not conclude that because "reason and experience" support the recognition of a reporter's privilege, it therefore followed that in all instances a reporter's confidential sources would be exempt from disclosure.  Rather, Judge Tatel concluded that just as the D.C. Circuit's civil cases balance "the public interest in protecting the reporter's sources against the private interest in compelling disclosure, so must the reporter privilege account for the varying interests at stake in different source relationships." <u>Id.</u> at 1174 (Tatel, J., concurring).  "In other words, to quote the Justice Department subpoena guidelines, 'the approach in every case must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice'." <u>Id.</u> (*quoting* 28 C.F.R. § 50.10(a)) (Tatel, J., concurring).

In <u>Miller</u>, Judge Tatel found that the leak at issue – the identity of a CIA operative – was a serious matter that could jeopardize covert activities of the United States and endanger the lives of others. <u>Id.</u> at 1178-79 (Tatel, J., concurring).  On the other hand, Judge Tatel also found the fact of that operative's employment "had marginal news value." <u>Id.</u> 1179 (Tatel, J., concurring).  As a result, Judge Tatel concluded – and the rest of the D.C. Circuit panel agreed – that, assuming arguendo that a reporter's privilege existed, the balance of interests tipped in favor of requiring the reporters to disclose their confidential sources in that case. <u>Id.</u> at 1183 (Tatel, J., concurring).

Judge Tatel candidly allowed, however, that in his judgment the analysis would have been different "were the leak at issue either less harmful or more newsworthy." <u>Id.</u> at 1164 (Tatel, J., concurring).  In this case, the balance is unequivocally in favor of non-disclosure and quashing the subpoena.  As discussed above, the justifications for Rule 6(e) secrecy are not

32

present in this case.  But even if they were, the disclosures in the July 2 news were not in the least bit harmful.  As discussed in detail above, virtually all the "news" in Mr. Levine's July 2 news report had been reported earlier, and repeatedly, by other news outlets.  The one fact that was news, the identity of defendant Isse, Mr. Levine learned from a non-governmental source identified by name in the July 2 news report.  At the time of July 2 news report, defendant Isse's indictment was over four months old.  He was already in custody and had already pleaded guilty, as had defendant Hassan.  A little over week after the July 2 news report, Isse's co-defendant – defendant Ahmed – was arrested, and he pleaded guilty approximately two weeks after that.  The news report did not identify an innocent defendant, result in the flight from jurisdiction of a charged defendant, or prevent the grand jury from indicting others in the future, which the grand jury did, and the government from obtaining their guilty pleas, which the government did.  In short, the disclosures reflected in the July 2 news report were not "less harmful" – they were not harmful at all.

In addition, the July 2 news report had actual news value.  It was the latest chapter in the coverage of an important, and much larger, story – the recruitment of Somali-Americans in Minneapolis to fight in an overseas terrorist organization.  Information about indictments, arrests, and guilty pleas played an important role in informing the public about the status of an investigation that senior government officials spoke openly and testified before Congress about, that news organizations reported frequently about, that parents of young men in the local Somali community in Minneapolis were particularly concerned about, and that local Minneapolis FBI officials acknowledged (six weeks prior) was "getting to that point in which [the FBI] will be able to go public with its findings."  *See, e.g.,* Laura Yuen, "FBI, Twin Cities Somalis hope to rebuild relationship," Minnesota Public Radio May 19, 2009.

33

Thus, unlike in <u>Miller</u> where the disclosure was harmful and the news value was limited, in this case the disclosure was not harmful and the news value was great.  Accordingly, this Court should find that a federal common law reporter's privilege not only exists, but on these facts the balance weighs in favor of finding that the privilege protects Mr. Levine from being compelled to reveal the names of his confidential sources.

### C.     The Subpoena Also Invades Mr. Levine's First Amendment Rights, and Therefore Must Be Quashed.[37]

In <u>Branzburg v. Hayes</u>, the Supreme Court rejected the argument that the First Amendment protected news media defendants from disclosing information provided to them by sources in confidence.  408 U.S. 665, 688-90 (1972).[38]  In rejecting the argument that the First Amendment protected the reporters in <u>Miller</u> from having to disclose their confidential sources, the D.C. Circuit based its holding on <u>Branzburg</u>.  438 F.3d at 1145.

However, such a holding does not properly account for the oft cited concurrence by Justice Powell in <u>Branzburg</u>, in which he emphasized "the limited nature of the Court's holding" and the need for a "case-by-case" balancing of First Amendment and law enforcement interests. <u>Branzburg</u>, 408 U.S. at 709-10 (1972) (Powell, J., concurring).  In later cases, Justice Powell emphasized the limited scope of Supreme Court's holding in <u>Branzburg</u>, and did so on more than one occasion.  In <u>Zurcher v. Stanford Daily</u>, Justice Powell observed that "in considering a motion to quash a subpoena directed to a newsman, the court should balance the competing values of a free press and the societal interest in detecting and prosecuting crime." 436 U.S. 547, 570 n.3 (1978) (Powell, J., concurring) (*citing* <u>Branzburg</u> concurrence); *see also* <u>Saxbe v.</u>

---

[37] In light of the <u>Miller</u> court's discussion and rejection of this argument, 438 F.3d at 1147-49, this Court may be disinclined to consider it here.  However, Mr. Levine raises this argument in order to preserve it on appeal.

[38] Because <u>Branzburg</u> pre-dates the 1975 adoption of the Federal Rules of Evidence, and specifically Fed. R. Evid. 501, any argument that <u>Branzburg</u> limits the ability of this Court to recognize a federal common law reporter's privilege should be rejected.

Washington Post Co., 417 U.S. 843, 859-60 (1974) (Powell, J., dissenting) ("I emphasized the limited nature of the *Branzburg* holding in my concurring opinion," and "a fair reading of the majority's analysis in *Branzburg* makes plain that the result hinged on an assessment of the competing societal interests involved in that case rather than on any determination that First Amendment freedoms were not implicated").  If Justice Powell's concurring opinion in Branzburg is to be given its due effect, then the majority's opinion must be read narrowly to provide for First Amendment interests to be weighed against law-enforcement interests.  And in this instance, those law enforcement interests yield to the First Amendment protections afforded to members of the press.

The D.C. Circuit's opinion in Miller is also inconsistent with First Amendment protections afforded to members of the press by other circuit courts.  *See* United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir. 1988); United States v. Burke, 700 F.2d 70 (2d Cir. 1983); United States v. Cuthbertson, 630 F.2d 139 (3d Cir. 1980).

5166564

## CONCLUSION

For the foregoing reasons, Mr. Levine respectfully requests this Court to quash the grand jury subpoena calling for Mr. Levine to reveal the names of his confidential sources.

Dated: May 3, 2011                    Respectfully Submitted,

                                      _____
                                      John S. Darden
                                      D.C. Bar. No. 999206
                                      PATTON BOGGS LLP
                                      2550 M Street, NW
                                      Washington, DC 20037-1350
                                      Tel:   (202) 457-6427
                                      Fax:   (202) 457-6315
                                      jdarden@pattonboggs.com

                                      Counsel for Mike Levine

5166564