UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

..................................................................................
                                                    :
In re: Grand Jury Subpoena           :          Misc. No. 11-261
                                                    :
                                                    :
                                                    :          **EX PARTE**
..................................................................................

## AFFIDAVIT OF SPECIAL AGENT KEVIN SHIRLEY

Senior Special Agent Kevin Shirley, United States Department of Justice, Office of Inspector

General (DOJ OIG), declares pursuant to Title 28, United States Code, Section 1746, as follows:

I.      Introduction

1.      I am currently assigned as a Senior Special Agent with DOJ OIG, in the Chicago office. I

have been a Special Agent for approximately 14 years. In connection with my official duties, I

investigate criminal violations by federal and state public officials. I have received training in the

enforcement of laws concerning public corruption investigations and have testified in judicial

proceedings relating to public corruption investigations.

2.      This affidavit is based upon information obtained from documents and law enforcement

records, discussions with law enforcement officials, interviews of witnesses, and additional

evidence, including sealed documents. Because of the limited purpose of this affidavit, I have not

set forth all the information of which I have become aware in the course of this investigation, but

have focused generally on the nature of the instant investigation.

3.      On September 24, 2009, DOJ OIG initiated an investigation into allegations that law

enforcement officials leaked sensitive information, including information protected by grand jury

secrecy under Federal Rule of Criminal Procedure 6(e), to Michael Levine, a reporter for the news

organization Fox News.

4.      As discussed more fully below, in late June or early July 2009, two unnamed law enforcement officials provided sensitive grand jury and under-seal information concerning pending terrorism investigations in Minneapolis, Minnesota, to Levine.  On July 1, 2009, Levine published an article entitled "Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say," in which he cited information provided purportedly by the law enforcement sources.

5.      Prompted by this disclosure, now-retired Judge James Rosenbaum wrote a letter to Attorney General Eric Holder, requesting that he initiate a leak investigation.  As a result, General Holder assigned the Criminal Division's Public Integrity Section to conduct the investigation, which has coordinated the investigation jointly with DOJ OIG.

II.      Factual and Investigative Background

        A.      Al-Shabaab and the Minneapolis Cases

6.      Minneapolis is home to the largest Somali community in the United States.  In October 2008, Shirwa Ahmed, a twenty-seven-year-old United States citizen of Somali descent and a resident of Minneapolis, traveled to Somalia and detonated a bomb strapped to his body, killing dozens. Ahmed is believed to be the first known American suicide bomber.  He was also not the only Somali-American recruited by the Al Qaeda-connected terrorist organization Al-Shabaab[1] to wage war against the West-backed government of Somalia.  Indeed, dozens of young Somali men have disappeared from communities throughout the United States, including, primarily, Minneapolis, presumably under the influence of Al-Shabaab and its recruiters, both domestic and foreign.

---

[1] Al-Shabaab has been designated as a "Foreign Terrorist Organization" under Section 219 of the Immigration and Nationality Act (as amended) and as a "Specially Designated Global Terrorist" under Section 1(b) of Executive Order 13224 (as amended).

7.     The Department of Justice, as well as a variety of agencies within the United States law enforcement and intelligence community, have begun investigating and gathering intelligence concerning Al-Shabaab and its operatives throughout the world. The Green Arrow Task Force, an inter-agency task force, comprising hundreds of ███████████████████████ personnel, was created in part to investigate terrorist funding activities in the United States. When law enforcement became aware of the problem of disappearing Somali youths, Operation Rhino, another task force, was created as a spin off from Green Arrow to focus on Al-Shabaab's recruiting activities in Minneapolis and elsewhere.  Operation Rhino similarly comprised a vast network of ███ ████████████████████ personnel.

8.     Through daily intelligence briefings and emails disseminated to a broad intelligence network, individuals involved in both Green Arrow and Operation Rhino shared information in aid of the broader mission to root out the seeds of domestic terrorism before they sprouted.

9.     In connection with the nationwide Green Arrow/Rhino investigation into Al-Shabaab, the United States Attorney's Office in Minneapolis charged three Somali-American men in two separate cases in February 2009 based on their participation in overseas Al-Shabaab training activities beginning in December 2007.

10.    In the first case, 09-cr-38-JMR, the United States charged Kamal Said Hassan by criminal information on February 11, 2009, with one count of providing material support to terrorists under 18 U.S.C. § 2339A(a) and one count of providing material support to a foreign terrorist organization under 18 U.S.C. § 2339B(a)(1). Hassan, a Minneapolis resident, was arrested in Yemen after he returned from Somalia following his recruitment and multi-month military training by Al-Shabaab.

11.    The same day, on February 11, 2009, Judge James M. Rosenbaum issued an oral order,

3

sealing the case.

12.     On February 18, 2009, the day of Hassan's arraignment and guilty plea, Judge Rosenbaum granted a joint motion by the parties to seal the courtroom during the plea hearing.

13.     Pursuant to a plea agreement and cooperation agreement, Hassan agreed to return to Minneapolis and assist law enforcement in a covert capacity in order to identify and gather evidence against individuals in the Somali community who were recruiting Somali youth to fight for Al-Shabaab.  During the next several months, Hassan, who resided in government-monitored lodging outside Minneapolis, recorded multiple conversations with members of the Somali community at the direction of law enforcement.[2]  Sealing Hassan's case thus was vital to ensuring his maximum utility as a cooperator.

14.     In the second case, 09-cr-50-JMR, the United States originally charged Abdifatah Yusuf Isse and Salah Osman Ahmed by indictment on February 19, 2009, with one count of providing material support to terrorists and conspiracy to kill, kidnap, maim, and injure, as to both, in violation of 18 U.S.C. § 2339A(a) & 956, respectively, and two counts of false statements as to Ahmed, in violation of 18 U.S.C. § 1001(a)(2).  As with their co-conspirator Hassan, the charges against Isse and Ahmed stemmed from their efforts to travel to Somalia and wage war on behalf of Al-Shabaab.

15.     The same day, February 19, 2009, Magistrate Judge Franklin L. Noel entered an oral order sealing the Isse/Ahmed matter.

16.     Isse, a resident of the State of Washington, who spent several weeks traveling to and approximately one week actually constructing an Al-Shabaab training camp in Southern Somalia

_____

[2] Hassan later pleaded guilty to an additional false statement count under 18 U.S.C. § 1001 based on lies he told the government during his early debriefings.

4

before departing the country, was arrested in Seattle on February 24, 2009, and transported to Minneapolis, where he was detained. At the time of his arrest, Isse was preparing to fly to Tanzania. Isse entered a guilty plea on March 4, 2009, and began cooperating with law enforcement. Isse's removal hearing from Seattle, arraignment in Minneapolis, and guilty plea were all held in closed courtrooms by permission of the Deputy Attorney General and order of the Court in order to maximize Isse's utility as a covert operative, as well as to protect his safety and that of his family. During his detention Isse gathered evidence at the direction of law enforcement through recorded phone calls and the use of internet-based communication services.

17.    Ahmed, who had also traveled to Somalia in December 2007 and spent a brief period constructing an Al-Shabaab training camp, ultimately returned to Minneapolis. Although Hassan and Isse were arrested and began cooperating with law enforcement in a covert capacity, Ahmed was not arrested immediately upon his return to Minneapolis. Rather, during much of Hassan's and Isse's cooperation, Ahmed remained in the community unaware that he had been indicted under seal.

18.    Ahmed eventually was arrested on July 11, 2009, and entered a guilty plea to one count of providing material support to terrorists on July 28, 2009.

19.    All early proceedings in both cases were nonpublic. In this manner, both cases remained completely under seal until July 13, 2009, and August 12, 2009, when Judge Rosenbaum unsealed the Isse/Ahmed and Hassan matters, respectively. Various pleadings, however, remain under seal.

        B.    The Leak and Request to Investigate

20.    On July 1, 2009, prior to Judge Rosenbaum's unsealing of either case, Levine, a Washington-based reporter for Fox News' online news site, published an article entitled "Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say." Salient portions of the article

read:

> A federal grand jury has indicted a group of Somali-Americans on terror-related charges after more than 20 young men from the Minneapolis area were recruited to join an Al Qaeda-linked group in Somalia, **according to two law enforcement sources**.

> The indictments have yet to be unsealed, but an announcement is expected in the next few weeks. **One law enforcement source** told FOX News the grand jury already has handed up indictments against at least three people.

> Among those charged is a man from Minneapolis who went to war-torn Somalia and then, about four months ago, relocated to Seattle, **according to the two sources** and a leader in the Minneapolis Somali community.  The man was then arrested in a Seattle airport and transferred to a jail in Minneapolis, where he is currently being detained, **according to the law enforcement sources**.

> **The law enforcement sources** said the man, described as in his 20s, has been charged with providing material support to a terrorist group, in this case al-Shabaab, which has been warring with the moderate Somali government since 2006.

> . . . .

> The investigation has centered around Minneapolis, where a grand jury has been hearing testimony from witnesses for several months, but the investigation has also been active in Seattle; Columbus, Ohio; Cincinnati; Boston; and San Diego.

> A source told FOX News in March that "several" recruits had returned to the United States, but counterterrorism officials have repeatedly said there is no intelligence indicating that any such recruits are planning attacks within the country.

> . . . .

> **One law enforcement source** said that shows "major progress" in the investigation, since [a local mosque] has been a focal point for investigators from the beginning.

21.     When the United States Attorney's Office ("USAO") in Minneapolis learned of the article,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ contacted the Office of the General Counsel of the Executive Office

of the United States Attorneys on July 2, 2009, and requested that a leak investigation be opened to

identify the law enforcement sources referred to in Levine's article. ███████ also requested that his entire office be recused from the leak investigation aspect of the case, as USAO personnel were potentially suspects or witnesses.

22.     In addition, when ████████████████████████████████, the lead prosecutor in the Isse/Ahmed and Hassan cases, notified Judge Rosenbaum of the Fox News article, Judge Rosenbaum wrote a letter to Attorney General Holder. The letter, dated July 7, 2009, read, in its entirety:

> Dear General Holder:
>
> I write out of grave concerns relating to the matter identified, above.[3]
>
> As you know, this case involves questions of international terrorism. From the time it was assigned, my staff and I have been under extraordinary secrecy restraints in its handling. We have also been given to understand additional related matters may be forthcoming. These security interests have led to FBI background checks on my staff, preliminary to obtaining certain classified materials, and to extraordinary protections for document and electronic materials.
>
> With these concerns as a backdrop, you can imagine my dismay when I learned, on Thursday, July 2, of Fox News's internet channel story outlining the content of the case assigned to me, as well as information concerning a Grand Jury investigation, and forthcoming related indictments. The Fox News story claimed unidentified law enforcement officials as the information source. See Mike Levine, Somali-Americans Accused of Al Qaeda Ties Indicted on Terror Charges, Sources Say, FoxNews.com, Jul. 2, 2009, http://www.foxnews.com/story/0,2933,529796, 00.html.
>
> I am concerned about potential deleterious effects on the matter pending before me, as well as any cases which may arise in the future. There are other issues and potential grave dangers, I need not outline, which may arise in the local community affected by these stories.
>
> With these thoughts in mind, I urge you to use the assets at your command

---

[3] Judge Rosenbaum identified the Isse/Ahmed case number in the reference line of his letter.

to investigate the sources of this material in order to protect the pending case, any upcoming cases, and the citizens of the United States.

23.     As noted, the matter subsequently was referred to the Public Integrity Section, which has conducted an investigation with the assistance of DOJ OIG.

      C.    Effects of the Leak

24.     The Minneapolis investigation suffered an immediate consequence of the law enforcement leak to Levine. ████████████████████████████████████



25.     To that end, on approximately the same day, July 2, 2009—the day following publication of Levine's article—the investigative team planned to record a meeting between Hassan and a possible recruiter in the Somali community.  However, the team was forced to reevaluate its planned operation because the leaked information—specifically the revelation that at least three individuals had been charged—posed a risk to Hassan's safety, ████████████████████████

████████████████.  Ultimately, the meeting took place, but was not nearly as productive as hoped.  For their part, the investigative team believed that Levine's story contributed to the subject's tight-lipped conduct during the meeting.

26.     In addition, the leaked information created the possibility that Ahmed, who had not been arrested, would surmise that he was one of the three individuals charged under seal and flee Minneapolis.  As a result, the investigative team placed Ahmed under 24-hour surveillance following the story to ensure he did not flee before his planned arrest on July 11, 2009.

8

27.     Although the investigative team hoped to utilize Ahmed to gather intelligence, as they had with Hassan and Isse, the publication of Levine's story and the revelations contained in it—printed with the imprimatur of two law enforcement sources—diminished his utility as a covert operative and contributed to the decision to unseal the Isse/Ahmed indictment on July 13, 2009.

28.     On July 22, 2009, and August 20, 2009, the grand jury in Minneapolis returned a superseding indictment charging an additional five defendants with terrorism offenses. The charges as to the additional defendants were subject to an oral sealing order until November 20, 2009, when the second superseding indictment was unsealed on motion of the United States. Because several of the defendants were not located in the United States, leaks such as those to Levine increased the risk that defendants residing abroad would not return.

29.     Moreover, because the local investigation into the use of Somali-Americans in terrorist activities in Somalia was part of a nationwide, highly sensitive, and coordinated investigation, the leaks printed in Levine's story had the potential to impact not only the local investigation, but national and even international counterterrorism efforts.

        D.      The Leak Investigation

                1.      Narrowing the Field

30.     From its outset, the investigation has focused on identifying the "law enforcement sources" referenced in Levine's July 1, 2009, Fox News article. This task, however, has proven exceptionally difficult and is complicated significantly by two issues: (1) the nature of the information disclosed and (2) the number of people privy to it.

31.     First, the leaked information—i.e., that at least three individuals, including one man arrested in Seattle, had been charged under seal with terrorism-related offenses in connection with their

9

support of Al-Shabaab—could easily be disclosed orally and was not confined to identifiable and traceable documents.

32.     Second, the leaked information would have been (and witnesses believe was) disseminated throughout vast intelligence networks via frequent intelligence briefings and email blasts. As such, the universe of individuals who would have known the sealed particulars of the Isse/Ahmed and/or Hassan cases is enormous. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

33.     Information regarding the Minneapolis investigations was disseminated not only to law enforcement special agents, but also to analysts, support personnel, and state and local members of the Green Arrow and Rhino task forces. Moreover, in light of the extremely sensitive nature of the investigations, high-ranking personnel ████████████████████████████████

████████████████████ received updates on operational and case-related developments.

34.     Nevertheless, a narrowing criteria presented itself during an initial review of DOJ email traffic ████████████████████████████████ email revealed that on two occasions—June 23, 2009, and June 30, 2009—meetings took place in the Minneapolis investigation during which prosecutors, law enforcement agents, and press personnel discussed unsealing the Hassan and Isse/Ahmed cases, developing a press strategy to manage relations with the generally distrustful Somali community in Minneapolis, and even issuing a press release or conducting a press conference.

35.     The first meeting took place in Minneapolis, with representatives from the USAO and local FBI Resident Agency in attendance. Additional personnel from DOJ at FBI HQ also attended (in

person and via teleconference).

36.     The second meeting, on June 30, 2009, took place in Washington at FBI HQ. Personnel from
the FBI Office of Public Affairs ("OPA") attended, along with the spokesman for DOJ's National
Security Division, which was working to coordinate terrorism cases nationwide.

21.     ████ correspondence revealed that, on June 24, 2009, the day after the first meeting in
Minneapolis, Levine contacted the local FBI press office regarding the Somali investigation. In
parallel fashion, Levine published his story the day after the June 30, 2009, meeting. In light of the
timing of Levine's inquiry and subsequent story, the investigation narrowed its focus to the two
meetings and the individuals in attendance.

37.     In addition, because Levine was based out of Washington (and in fact maintains a desk in
the DOJ press pool within the Main Justice Building), the investigative team concluded that the leak
likely came from Washington sources.[4] This view was later supported through witness interviews.

        2.      Reviewing Email

38.     In addition to ████ s email, the team has reviewed the official, unclassified email
accounts for the following individuals,[5] all of whom were in attendance at one or both of the
identified meetings in June 2009:



---

[4] Although the investigation focused on both agents and attorneys, one factual inaccuracy
in Levine's story—namely, that the defendants had been indicted, when, in fact, one had been
charged by criminal information—suggested that the "law enforcement sources" were not
lawyers.

[5] Since the time of the e-mail review, the listed positions for each individual have, in
some cases, changed.

11



39.     We also reviewed emails contained on the classified accounts of the following individuals:

40.     Review of over 1000 emails from these accounts, however, did not help ascertain the likely sources of the leak to Levine.  On the contrary, to the extent individuals referenced Levine or his July 1, 2009, article, such references consistently demonstrated the writer's (or other parties') position that the leak was detrimental to the cases already charged, as well as the ongoing investigation. Focusing on email correspondence during the relevant time frame, therefore, provided no clear indication that any of the individuals present at either meeting leaked any information to Levine or any other reporter.

41.     To the extent the email review revealed communication between Levine and government personnel during the relevant period of time in the first half of 2009, nothing in these interactions

suggested the identities of the sources of the July 1, 2009, leaks. Indeed, even Somali-terrorism-related inquiries from Levine did not provide any evidence that he enjoyed any suspicious relationship with the e-mail recipient.

### 2. Reviewing Phone Records

42. In addition, we conducted a review of official DOJ phone records. This review similarly proved fruitless in ascertaining the law enforcement source of Levine's information. During May and June 2009, we located no calls made to telephone numbers associated with either Levine or ████████████, a reporter ████████████████ who published a similar article on the Somali terrorism investigation several days after Levine.[6]

43. Between February 2009 and January 2010, we identified approximately 243 phone calls between FBI land lines/cellular telephone numbers and phone numbers associated with Levine and ████. Of those calls, 121 were to or from official cell phones assigned to ████████████ ████████████████████████████. However, each of these individuals worked in a press capacity, and contact with either reporter was neither surprising nor prohibited. Similarly, the review revealed 109 calls to or from other FBI employees in Minneapolis. Again, the calls did not correspond to the relevant time period. The remaining thirteen calls, ████████████████ ████████████████████████████ also did not prove useful in identifying the potential leakers.

### 3. Witness Interviews

44. In addition to reviewing email traffic and official phone records, the investigative team

---

[6] Unlike Levine, ████ developed her story using sources in the Somali community and did not publish sealed or otherwise protected information from law enforcement sources.

conducted interviews of eleven DOJ and FBI employees who were present at one or both of the meetings in June 2009. Interviews were conducted with the following personnel:



45.     Although the interviews proved useful in fleshing out the various institutional prerogatives that developed with respect to a press strategy (if any) for the Somali investigation, this investigative strategy also failed to produce credible evidence of the sources' identities.

46.     In an interview with ▓▓▓▓▓▓▓▓▓▓▓▓▓ suggested that Special Agent ▓▓▓▓▓▓ might be the source of the leak. In ▓▓▓ 's view, ▓▓▓ spearheaded a position taken by FBI HQ and OPA that there should be a national press strategy with respect to the Somali investigation. Specifically, ▓▓▓ had developed a community outreach initiative prior to his assignment in OPA, pursuant to which the FBI and other government partners would work with the Somali community to build trust and foster cooperation in identifying individuals within the

14

community who were supporting terrorist interests. According to ▇▇▇▇▇ did not agree with a decision to keep the cases under seal and not issue a press statement as part of the community outreach initiative.

47.    However, interviews with OPA personnel did not support ▇▇▇ assertion that ▇▇ might have leaked information about the cases to Levine. ▇▇▇▇▇, for example, ▇▇▇▇▇▇▇ ▇▇ stated unequivocally that ▇▇▇ would not have been the leak. ▇▇ stated that ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ advocated for a national strategy involving statements from the highest level of the FBI. Leaks of the kind at issue in this investigation did not benefit ▇▇ or his community outreach initiative.

48.    Moreover, during his interview, ▇▇ confirmed ▇▇ asssertion. According to ▇▇, the first time he would have ever spoken to Levine was several months after the July 1, 2009, article, when ▇▇ was specifically assigned to serve as a point person for the press. Prior to that assignment, ▇▇ stated that he would not have spoken to Levine and, in fact, had no idea who he was. According to ▇▇, he and ▇▇ simply did not see eye to eye on the community outreach initiative. Although ▇▇ believed that working with the Somali community could help foster trust and perhaps develop useful sources, leaks to the press were not a means of effecting such a goal. Because leaks often spread inaccurate information and take the messaging out of the hands of the government and put it into the hands of the media, ▇▇ stated that there was no upside to disseminating sensitive case information. Moreover, where, as here, the only people charged (at the time) were the recruits—and not the recruiters—a leak potentially could send the wrong message to the community—i.e., that the government was after impressionable Somali youths, themselves possible victims of brainwashing by the real criminals.

49.    In ▮▮▮▮▮▮ view, the community outreach strategy had to involve statements from the highest echelons within FBI, including Director Robert Mueller. Indeed Mueller has made multiple public statements concerning recruitment and radicalization of Somali-American youths.

50.    Thus, while there may have been some disagreement in the June 23 and June 30 meetings regarding when to unseal the Isse/Ahmed and Hassan cases and how best to develop a subsequent press strategy (if at all), the individuals interviewed expressed consensus that the leaks documented in Levine's story were detrimental to the investigation. All interviewees agreed that no one benefitted from the leaks.

51.    Several of the interviewees, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, stated their belief that the leak likely would have come from someone well briefed but poorly invested in the investigation. None of the interviewees, however, provided any concrete information pointing to specific individuals as the sources of the leak. Indeed, they acknowledged that any attempt to identify a particular individual or law enforcement agency was simply speculation.

52.    After completing the above-noted review of email communications and phone records, as well as conducting interviews of individuals who participated in the press- and case-related meetings temporally connected with the publication of Levine's story, we concluded that there existed no viable investigative leads to ascertain the identities of the two law enforcement sources referenced in the article. Our attempt to narrow the universe of potential leakers had not produced concrete evidence of who the leakers were, and, as a result, we were left where we started, with a relatively large pool of suspects.

53.    On June 30, 2010, we contacted Levine directly in an attempt to arrange a voluntary interview. Specifically, we informed him that we wished to interview him regarding the sources

referenced in his July 1, 2009, news article. Levine responded that any request should be documented in an email. In response to our subsequent email, explaining the purpose of our inquiry, Levine directed us to Fox News legal counsel ▮▮▮▮▮▮. ▮▮▮▮▮ confirmed that Fox News and Levine would not disclose the law enforcement sources used for Levine's article.

54.     Shortly thereafter the Public Integrity Section sought approval pursuant to 28 C.F.R. § 50.10 to subpoena documents and testimony from Levine. On December 15, 2010, Attorney General Holder authorized issuance of the grand jury subpoena to Levine, compelling him to provide information regarding the identities of his law enforcement sources and the nature of their communications regarding the July 1, 2009, story.

55.     After issuance of the subpoena to Levine, through Fox News, on January 24, 2011, counsel for Levine, Jay Darden, provided an attorney proffer on March 8, 2011, regarding Levine's likely testimony. Darden stated he had a meeting with Levine to discuss the documents that were requested by the government. Levine informed Darden that there were no documents in existence that identified the law enforcement sources mentioned in the July 1, 2009. With respect to Levine's recollection, Darden stated that Levine was unable to identify the law enforcement sources referred to in the story.

56.     Darden explained that Levine had done a series of stories on the Somali topic and the July 1, 2009, article may have been his sixth or seventh story of the series. Levine wrote several additional stories on the Somali topic after the July 1, 2009, article.

57.     According to Darden, the universe of people that Levine was in contact with about the Somali topic numbered in the dozens; however, the group from which he could have gathered the information contained in the article was between five and twelve people. Levine possessed some

notes that pertained to the series of Somali stories, but not specifically about the July 1, 2009, article. According to Darden, there was no way to refresh Levine's memory of what sources were used for the story. Darden also stated that there were no confidentiality forms or agreements between Levine and the sources Levine used for the story. Levine could provide the government with the names of the people he talked to for the article, but could not confirm "who said what to him."

58.     To further negotiations, on April 13, 2011, Levine participated in a voluntary proffer with DOJ OIG and the Public Integrity Section. According to Levine, most of the information used in his article came from ▮▮▮▮ a community activist in Minneapolis. Levine took the information he received from▮ and attempted to reach out to anyone who could assist him in gathering information on the Somali-American story by verifying the information that ▮ had provided.

59.     Levine stated that the "two law enforcement sources" referenced in the article would have come from a group of five individuals in the law enforcement community. However, he would not divulge the names of any of the five.

60.     Although he was willing to distinguish sources referenced as "law enforcement"—e.g., DHS, FBI, DOJ—from those in the intelligence community—e.g., CIA, NSA, NSC—he also stated that he defined "law enforcement source" broadly to include not only investigative agents, but also support, press, and management personnel. As such, narrowing based on Levine's stated definition of "law enforcement" would still leave a relatively large pool of possible leakers.

61.     Levine also stated that he would not disclose whether the law enforcement sources were in Minneapolis, Washington, or both. However, he did confirm that the sources would not have been state or local personnel.

18

62.     Levine attempted to minimize the information he attributed directly to law enforcement
sources, claiming that he had only gleaned passive confirmation from them of information sourced
from ▮▮▮▮▮▮

63.     Subsequent review of an FBI interview report, dated May 20, 2009, in which ▮▮▮▮
documented a conversation he had with ▮▮▮ in Washington, D.C., suggests that ▮▮▮ likely was
not the source of at least one piece of critical information attributed to law enforcement sources in
the July 1, 2009, article.  During the conversation with ▮▮▮▮▮▮ stated that he was aware
through contacts with the community and the travelers' families of only two people who had been
charged, one of whom was ▮▮▮▮▮▮ did not identify Hassan, and, notably, he did not indicate that
he was aware of a third sealed defendant.  As such, contrary to Levine's assertion, it is unlikely that
▮▮▮▮ provided all of the information he attributed to law enforcement sources in his story.

III.    Conclusion

64.     As the investigation to date has not generated reasonable means to identify the law
enforcement sources referenced in Levine's article, we believe enforcement of the grand jury
subpoena is the only investigative measure likely to advance the leak investigation.


        I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
31st day of May 2011.

                                        Kevin Shirley
                                        Senior Special Agent
                                        United States Department of Justice
                                        Office of the Inspector General


                                        19