**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

**JUL 2 5 2011**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

)
)
In re Grand Jury Subpoena                )        Misc. No. 11-261 (RCL)
)
_____)

## MEMORANDUM OPINION & ORDER

Before the Court are Michael Levine's Motion [2] to Quash Grand Jury Subpoena and

intervenor Fox News Network, LLC's Motion [17] to Quash Subpoena to Michael Levine. Upon

consideration of the motions to quash, the government's combined opposition [8] and the replies

thereto [13, 14], the record herein, and the applicable law, the Court will deny both motions for

the reasons set forth below.

### I.  BACKGROUND

In July 2009, the Department of Justice began investigating whether government officials

had violated federal law by making unauthorized disclosures of sensitive information concerning

an ongoing terrorism investigation in Minneapolis, Minnesota. Opp'n to Mots. to Quash 1 [8]. In

the underlying investigation, three Somali-Americans were charged with offenses stemming

from their involvement with Al-Shabaab, a terrorist organization that had recruited young

Somali-Americans to commit acts of terrorism against the Somali government. *Id.* Then-Judge

James Rosenbaum presided over the cases, which were filed under seal. *Id.* On July 1, 2009,

FoxNews.com posted an article by Levine that credited two unnamed "law enforcement sources"

with providing information regarding, among other things, the existence of sealed grand jury

indictments against at least three Somali-Americans. *Id.* at 3–4; Levine's Mot. to Quash Ex. A.

Judge Rosenbaum, concerned that the article threatened the viability of both charged and future

1

cases stemming from the grand jury's investigation into Somali extremism, requested that the government initiate the instant leak investigation. Opp'n to Mots. to Quash 2 [8].

As part of its leak investigation, the government issued a grand jury subpoena to Levine, compelling him to provide documents and testimony necessary to identify the law enforcement sources cited in his story. *Id.* Levine and his employer, Fox News,[1] have moved separately to quash the subpoena, arguing (1) that the subpoena violates the First Amendment guarantee of freedom of the press; (2) that the Court should recognize a qualified federal common law reporter's privilege and hold that the subpoena violates that privilege; and (3) that the subpoena is unreasonable and oppressive under Federal Rule of Criminal Procedure 17(c). The government, in opposing the motions to quash, has submitted the *ex parte* affidavit of Special Agent Kevin Shirley of the Department of Justice Office of Inspector General.[2]

## II.   DISCUSSION

### A. *First Amendment Reporter's Privilege*

Movants concede, as they must, that the Supreme Court has expressly held that journalists do not enjoy a First Amendment privilege to refuse to disclose confidential sources to a grand jury. *Branzburg v. Hayes*, 408 U.S. 665, 690 (1972).[3] And as the D.C. Circuit has stated, "the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists from appearing before a grand jury or testifying before the grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any

---

[1] The Court granted [16] Fox News' Motion to Intervene [3] on July 8, 2011.

[2] In an opinion issued this day, the Court has denied movants' Joint Motion [12] to Disclose Portions of the *Ex Parte In Camera* Affidavit of Kevin Shirley.

[3] Although the Supreme Court indicated that a qualified First Amendment privilege would be available where "grand jury investigations [were] instituted or conducted other than in good faith," *Branzburg*, 408 U.S. at 707, that is clearly not the case here.

source. . . . Without doubt, that is the end of the matter." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1147 (D.C. Cir. 2006). Given such clear precedent on the issue, this Court rejects movants' argument as to a First Amendment reporter's privilege.

### B. Federal Common Law Reporter's Privilege

Movants also concede that there is no federal common law privilege for reporters. They nonetheless ask this Court to recognize such a privilege pursuant to Federal Rule of Evidence 501. Movants contend that an analysis consistent with *Jaffee v. Redmond*, 518 U.S. 1 (1996), compels the conclusion that a qualified federal common law reporter's privilege exists. They further suggest that the Court apply the balancing test proposed in Judge Tatel's concurring opinion in *Miller*, 438 F.3d at 1175, to find that the privilege requires that the instant subpoena be quashed. The government argues that movants' request is foreclosed by *Branzburg*, in which the Supreme Court declined to create such a privilege. The government further argues that, even if *Branzburg* does not foreclose the creation of the privilege, the Court should not recognize the privilege here.

Federal Rule of Evidence 501 authorizes courts to recognize common law testimonial privileges if doing so is prudent "in the light of reason and experience." Fed. R. Evid. 501; *see also Jaffee*, 518 U.S. at 8. The recognition of a new common law privilege "should be determined on a case-by-case basis." *Jaffee*, 518 U.S. at 8 (quoting S. Rep. 93-1277, at 13 (1974)) (internal quotation marks omitted). Rule 501 "did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" *Id.* at 9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)).

In *Jaffee*, which recognized a psychotherapist-patient privilege, the Supreme Court reiterated the "fundamental maxim that the public . . . has a right to every man's evidence." *Jaffe*, 518 U.S. at 9 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)) (internal quotation marks omitted). Thus, any testimonial privileges that exist "are distinctly exceptional, being so many derogations from a positive general rule." *Id.* (quoting *Bryan*, 339 U.S. at 331). Against this backdrop, the *Jaffee* Court focused on four factors regarding the existence of a common law privilege: (1) whether the privilege is "rooted in the imperative need for confidence and trust"; (2) whether the privilege would "serv[e] public ends"; (3) "the likely evidentiary benefit that would result from the denial of the privilege"; and (4) the extent to which the states have recognized the privilege. *Id.* at 10–15 (internal quotation marks omitted); *see also In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) (summarizing the *Jaffee* factors).

In *Branzburg*, the Supreme Court—in rejecting a reporter's privilege under the First Amendment, *see supra* Part I.A—also analyzed whether such a privilege exists at common law in the grand jury context. *See Branzburg*, 408 U.S. at 685–93. The Court noted that "[a]t common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." *Id.* at 685 (collecting cases). This view of the law, the Court explained, "is very much rooted in the ancient role of the grand jury." *Id.* at 686. Turning to the argument that confidential sources might be deterred from providing information if newsmen were required to testify, the Court stated that "the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the

4

testimonial obligations of newsmen." *Id.* at 693. Thus, the Court ultimately declined to recognize a reporter's privilege at common law. [4]

To be sure, is unclear whether *Branzburg* definitively rejected a federal common law reporter's privilege. More than thirty years after *Branzburg*, the D.C. Circuit stated that it was "not of one mind on the existence of a common law privilege." *Miller*, 438 F.3d at 1150. *Miller* involved former *New York Times* reporter Judith Miller, who spent 85 days in jail before agreeing to reveal her confidential sources to a grand jury investigating the leak of a CIA agent's identity. In *Miller*, "Judge Sentelle would hold that there is no such common law privilege" and "Judge Henderson believes that we need not, and therefore should not, reach that question." *Id.* Judge Sentelle explained that the Supreme Court had "expressly discusse[d] the possible protection of common law and in the end reache[d] a result that leaves the reporters unprotected." *Id.* at 1154 (Sentelle, J., concurring). He thus took the view that *Branzburg* had indisputably foreclosed the creation of a common law reporter's privilege. *Id.* Only Judge Tatel wrote in support of the privilege. He proposed a test for applying the privilege in leak cases—the test that movants advocate here—that would require courts to "consider not only [1] the government's need for the information and [2] exhaustion of alternative sources, but also [to] . . . weigh [3] the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value." *Id.* at 1175 (Tatel, J., concurring in the judgment). The third prong of this test was rooted in the D.C. Circuit's First Amendment cases in the civil context, which Judge Tatel read to require a

---

[4] Federal Rule of Evidence 501, adopted several years after *Branzburg*, does not affect the Supreme Court's assessment of the common law argument. While Rule 501 did not freeze the law of privileges, it "left the law of privileges in its present state." Fed. R. Evid. 501 advisory committee's note.

balancing of competing public interests. *Id.* at 1174–75 (citing *Zerilli v. Smith*, 656 F.2d 705, 712–14 (D.C. Cir. 1981)).

As *Miller* makes clear, the D.C. Circuit has not recognized a federal common law reporter's privilege. But the divergence of opinion in *Miller* is not an open invitation to this Court to create such a privilege. As noted above, it is an ancient proposition of law that the public "has a right to every man's evidence." *Branzburg*, 408 U.S. at 688 (internal quotation marks omitted); *see also Jaffee*, 518 U.S. at 9. Thus, privileges against forced disclosure—whether established in the Constitution, by statute, or at common law—"are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also Jaffee*, 518 U.S. at 9. Accordingly, courts should "proceed as cautiously as possible 'when erecting barriers between us and the truth.'" *Miller*, 438 F.3d at 1161 (Henderson, J., concurring) (quoting *Univ. of Penn. v. EEOC*, 493 U.S. 182, 189 (1990) (Scalia, J., dissenting)). It is with these principles in mind that the Court proceeds to address the question of whether to recognize a reporter's privilege at common law.

In the wake of *Miller*, two courts in this district have refused to recognize a common law reporter's privilege in the context of civil litigation. *See Hatfill v. Gonzales*, 505 F. Supp. 2d 33 (D.D.C. 2007); *Lee v. Dept. of Justice*, 401 F. Supp. 2d 123 (D.D.C. 2005). In *Lee*, Judge Collyer noted the disagreement in *Miller* as to whether *Branzburg* had definitively rejected a reporter's privilege at common law. *Lee*, 401 F. Supp 2d at 136. Concluding that "*Branzburg* is not dispositive within the D.C. Circuit in the context of civil litigation," she proceeded to analyze the proposed privilege in light of the Supreme Court's framework in *Jaffee*. *Id.* First, Judge Collyer rejected Judge Tatel's proposed balancing test for applying the privilege. *Id.* at 137–39. She explained that Judge Tatel had imported this test from *Zerilli*, 656 F.2d at 712–14, which

evaluated the reporter's privilege under the First Amendment in civil cases. *Lee*, 401 F. Supp. 2d at 138–39. Judge Collyer concluded that she could not "reasonably import a three-part test from *Zerilli*, a First Amendment case, into a common law privilege as if consensus on the privilege and that test already existed when it so obviously does not." *Id.* at 139. She further explained that the D.C Circuit had later held that *Zerilli* imposed a *two-part* test—focusing on the need for the information and exhaustion of alternative sources—to overcome a reporter's privilege under the First Amendment. *Id.* at 138–39; *see also Lee v. Dept. of Justice*, 413 F.3d 53, 56–57 (D.C. Cir. 2005) (reaffirming *Zerilli*'s two-part test). In so doing, the D.C. Circuit effectively disavowed the reading of *Zerilli* on which Judge Tatel had based his balancing test. *Lee*, 401 F. Supp. 2d at 138.

Judge Collyer then noted that the Supreme Court had rejected a balancing test in *Jaffee*—the kind of balancing that movants, in reliance on Judge Tatel's *Miller* concurrence, suggest here—because "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *Id.* at 139 (quoting *Jaffee*, 518 U.S. at 17–18) (internal quotation marks omitted). Similarly, "[s]ubmission of a reporter's privilege to a judge's determination of the newsworthiness of his or her story is also very troubling." *Id.* Judge Collyer also found that the modern proliferation of media would make it impossible to determine who is a "reporter" eligible to claim the privilege. *Id.* at 140 (citing *Miller*, 438 F.3d at 1156 (Sentelle, J., concurring) (questioning whether the privilege would protect "the stereotypical 'blogger' sitting in his pajamas at his personal computer posting on the World Wide Web")). Because "reporters as a group are very different from and much less distinct than the psychotherapists addressed in *Jaffee* . . . it can hardly said that such a privilege would be certain or narrowly drawn." *Id.* This kind of uncertainty would fly in the face of the

Supreme Court's admonition that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying application by the courts, is little better than no privilege at all." *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)) (internal quotation marks omitted).

Finally, with respect to the *Jaffee* factors, Judge Collyer found that the "imperative need for confidence and trust" recognized in *Jaffee* did not apply in the context of a reporter's privilege. *Id.* Psychotherapy is wholly dependent on a patient's ability to speak freely, whereas "[a]nonymous sources are not a *sine qua non* of journalism but only an important and useful tool." *Id.* at 140–41. Furthermore, a psychotherapist privilege, in facilitating the appropriate provision of mental health treatment, promotes "a public good of transcendent importance." *Id.* at 140 (quoting *Jaffee*, 518 U.S. at 11). By contrast, the "right to keep confidential an anonymous source is not 'transcendent' in the same sense." *Id.* at 141. In light of these factors, Judge Collyer refused to recognize a common law reporter's privilege.

In *Hatfill*, Judge Walton endorsed Judge Collyer's rejection of Judge Tatel's balancing test, as well as her conclusion that *Jaffee* counseled against the creation of a common law reporter's privilege. *Hatfill*, 505 F. Supp. 2d at 47–48. In so doing, Judge Walton explained that his "[r]efusal to acquiesce to the pleas of the reporters comports with the guidance from both the Supreme Court and the District of Columbia Circuit that 'new privileges should be created sparingly and with caution.'" *Id.* at 47 (quoting *Lee*, 401 F. Supp. 2d at 136–37).

This Court agrees with Judge Collyer's analysis in *Lee*. Notably, the courts in both *Lee* and *Hatfill* refused to recognize a common law reporter's privilege in context of *civil* litigation. Their analysis thus resonates even more strongly here, where Levine has been subpoenaed to testify before the grand jury. The fundamental maxim that the public has a "right to every man's

8

evidence" is "particularly applicable to grand jury proceedings." *Branzburg*, 408 U.S. at 688 (internal quotation marks omitted); *cf. Zerilli*, 656 F.2d at 711 (noting that the First Amendment reporter's privilege is more robust in civil cases, "where the public interest in effective criminal law enforcement is absent," than in grand jury or criminal proceedings). Thus, the caution with which this Court must evaluate movants' request, *see Nixon*, 418 U.S. at 710, is even more pronounced in the grand jury context.

At the outset, the Court rejects Judge Tatel's proposed balancing test and thus declines movants' invitation to balance the value of Levine's story against the alleged harm caused by the leak. *See* Levine's Statement of P. & A. in Supp. of Mot. to Quash 31–34 [2] ("Levine Mem."); Fox News' Mem. of P. & A. in Supp. of Mot. to Quash 34–37 [17] ("Fox Mem."). First, the disagreement in *Miller* cautions against adopting Judge Tatel's test—particularly as part of a privilege that has yet to be recognized in this Circuit. But even if the privilege were recognized, the Court agrees with Judges Collyer and Walton's conclusion that the test is unworkable. *See Hatfill*, 505 F. Supp. 2d at 47; *Lee*, 401 F. Supp. 2d at 139. Judge Tatel's test would require courts to determine the newsworthiness of a reporter's story—a purely subjective determination—and then to engage in the "well-nigh impossible task" of weighing newsworthiness against the harm caused by the leak. *Lee*, 401 F. Supp. 2d at 139. "Such a practice would create a subjective and elastic standard whose outcome could not be predicted." *Id.* This Court will not apply a test that would give such indistinct contours to a common law privilege. *See Upjohn*, 449 U.S. at 393 (cautioning against the creation of uncertain privileges).

The Court now turns to movants' argument that *Jaffee* mandates recognition of a common law reporter's privilege. In *Jaffee*, the Supreme Court—noting the "sensitive nature of the problems for which individuals consult psychotherapists"—found that psychotherapy "is

9

*completely dependent* upon [the patients'] willingness and ability to talk freely." *Jaffee*, 518 U.S. at 10 (internal quotation marks and citations omitted) (emphasis added). *Jaffee* thus recognized that the psychotherapist privilege, like the spousal and attorney-client privileges, is "rooted in the imperative need for confidence and trust." *Id.* *Jaffee* further recognized that the psychotherapist privilege serves the public interest in our citizenry's mental health—a "public good of transcendent purpose." *Id.* at 11. By contrast, a free press does not *completely depend* on a reporter's right to keep sources confidential, nor are confidential sources are a "public good of transcendent purpose." *Id.*; *see also Hatfill*, 505 F. Supp. 2d at 45; *Lee*, 401 F. Supp. 2d at 141. Simply put, a reporter's privilege wouldn't serve public ends in the manner envisioned by the Supreme Court. *See Jaffee*, 518 U.S. at 11 (noting that the attorney-client privilege promotes the observance of law and the administration of justice; that the spousal privilege furthers marital harmony; and that the psychotherapist privilege facilitates the appropriate treatment of mental health problems).

Movants, maintaining that investigative reporting *depends* on confidential sources, argue that the absence of a reporter's privilege chills investigative reporting because "[m]any sources simply do not confide important information unless they can do so confidentially." Fox Mem. 25 [17]; *see also* Levine Mem. 27–29 [2]. But like the Supreme Court in *Branzburg*, this Court "remain[s] unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury." *Branzburg*, 408 U.S. at 693. Forty years after *Branzburg*, it remains true that "[e]stimates of the inhibiting effect of such subpoenas on the willingness of informants to make disclosures to newsmen are widely

divergent and to a great extent speculative." *Id.* at 693–94.[5] Thus, for the reasons discussed above, the Court finds that *Jaffee* counsels against recognition of a federal common law reporter's privilege.[6]

### C. Federal Rule of Criminal Procedure 17(c)

Alternatively, movants argue that—regardless of whether the Court recognizes a common law reporter's privilege—the instant subpoena should be quashed because it is unreasonable and oppressive under Federal Rule of Criminal Procedure 17(c). Under Rule 17(c), "the court may quash or modify [a] subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). The law presumes, however, "that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enters.*, 498 U.S. 292, 300 (1991). This presumption takes into account the "unique role" that the grand jury occupies in our criminal justice system. *Id.* at 297. As the Supreme Court has explained,

> The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush.

---

[5] The *Jaffee* Court also found that the "evidentiary benefit that would result from the denial of the [psychotherapist] privilege is modest." *Jaffee*, 518 U.S. at 11. "[I]f the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled," making it unlikely that such evidence would come into existence at all. *Id.* at 11–12. But this line of reasoning doesn't help movants, as the Court is not convinced that conversations between reporters and their sources will "surely be chilled" in the absence of a reporter's privilege.

[6] Having declined to recognize a common law reporter's privilege, the Court need not consider whether there is a consensus among the states regarding the privilege. *See Jaffee*, 518 U.S. at 12–14 (noting that all fifty states and the District of Columbia had created a psychotherapist privilege through legislation). Although a consensus among the states can confirm "that it is appropriate for the federal courts to recognize" a common law privilege, *id.* at 12, it does not *mandate* such recognition. Here, "reason and experience" counsel this Court that it is not prudent to recognize the proposed privilege, and that is the end of the matter. Fed. R. Evid. 501; *see also Jaffee*, 518 U.S. at 8.

*Id.* Grand jury subpoenas are therefore "much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged." *Id.* The rules and evidentiary restrictions that apply to trial subpoenas do not apply to grand jury subpoenas, as such requirements would impede the work of the grand jury and compromise the secrecy of grand jury proceedings. *Id.* at 298–99. "Consequently, a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *Id.* at 301.

"The investigatory powers of the grand jury are nevertheless not unlimited." *Id.* at 299. Thus, a court may quash a grand jury subpoena where the subpoena infringes on constitutional, common law, or statutory privileges. *Branzburg*, 408 U.S. at 688. Even where no privilege exists, a court may exercise its supervisory powers under Rule 17(c) to quash a subpoena that is unreasonable and oppressive. *In re Grand Jury Matters*, 751 F.2d 13, 17–18 (1st Cir. 1984). In determining whether it is appropriate to grant a motion to quash under Rule 17(c), "what is reasonable depends on the context." *R. Enters.*, 498 U.S. at 299 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 387 (1985)) (internal quotation marks omitted). Courts may consider, for example, whether a subpoena seeks irrelevant material or is overbroad. *See, e.g.*, *United States v. Loe*, 248 F.3d 449, 466 (5th Cir. 2001); *In re Grand Jury Matters*, 751 F.2d at 18. Additionally, it is likely appropriate to quash a subpoena that is abusive or harassing. *See, e.g.*, *R. Enters.*, 498 U.S. at 299 ("Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."). Finally—and as movants suggest is relevant here—courts have balanced the government's interest in enforcing a subpoena against the burden of compliance. *See, e.g.*, *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585–86 (4th Cir. 2007) (citing *R. Enters.*, 498 U.S. at 303 (Stevens, J., concurring in

part and concurring in the judgment) (finding that *R. Enters.*'s "attempt[] to define the term 'reasonable' in the abstract" would not provide adequate guidance to district courts, and thus suggesting that Rule 17(c) "requires the district court to balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other")); *In re Grand Jury Matters*, 751 F.2d at 18 (affirming a district court's decision to quash a subpoena where enforcement seemed "likely to entail consequences more serious than even severe inconveniences occasioned by irrelevant or overbroad requests" and where the government had failed to "demonstrate[] a more urgent need for the information"). Such balancing must, of course, "[take] place with an explicit recognition that a presumption of regularity attaches to grand jury subpoenas." *In re Grand Jury, John Doe*, 478 F.3d at 585.

Movants do not assert that the subpoena at issue seeks irrelevant information, is overbroad, or constitutes harassment. Rather, they argue that the burden of complying with the subpoena is so unreasonable that it outweighs the government's interest in enforcement. Levine Mem. 20–24 [2]; Fox Mem. 40–43 [17]. Specifically, movants state that Levine cannot recall which two law enforcement officials he cited in his July 1 article. Thus, they argue, the burden of compliance would be "uniquely severe" because Levine would have to disclose the names of all five officials he spoke with in preparing the article. Levine Mem. 22–24 [2]; Fox Mem. 40–41 [17]. Movants contend that requiring Levine to disclose all five sources—three of whom wouldn't be targets of the grand jury's investigation—would not only "undermine his relationships with his current sources, but it would prevent him from developing new sources in the future." Levine Mem. 23 [2]. Additionally, movants argue that the government's interest in enforcement is modest because the leak did not harm the underlying terrorism investigation and because the information that Levine attributed to "law enforcement sources"—that is, that a

grand jury had indicted three individuals in the Al-Shabaab case—was already public and thus did not constitute "leaked" information. Levine Mem. 2–3, 20 [2]; Fox. Mem. 6–8, 35, 42–43 [17].

The Court finds that the subpoena is not unreasonable or oppressive. First, the government's interest in enforcement of the subpoena is far from modest. Given that Levine can narrow the field of potential leakers down to five individuals, there is no doubt that the information sought is critical to the grand jury's investigation. And as the Shirley Affidavit indicates, the government was unsuccessful in its efforts to obtain relevant information regarding Levine's sources prior to issuing the subpoena. Opp'n to Mots. to Quash 22 & n.7 [8]. Moreover, the information sought by the subpoena includes Levine's account of his communications with his sources—information for which there exist no alternatives. *Id.* As to movants' claim that the leak caused no harm, the Shirley Affidavit states that the publication of Levine's article forced the government to alter its conduct in the underlying investigation. The fact that no subjects of the investigation sought to evade law enforcement, while fortuitous, does not negate the fact that the government had to alter its conduct. Furthermore, the government's interest in enforcement is justified not only by *actual* harm, but also by any *potential* harm stemming from the leak. Finally, with regard to movants' claim that Levine's article contained no information that was not already public, the Court notes two features of the article that movants ignore. First, movants cite several news stories concerning the Al-Shabaab investigation, but identify no stories that attributed information about sealed indictments to *law enforcement sources*. *See* Levine Mem. 20 [2]; Fox. Mem. 6–8 [17]. It is fair to say that information that boasts the imprimatur of *law enforcement sources* can be given more credence—and thus has greater potential to cause harm to an underlying investigation. Second, Levine attributed to a law enforcement source the fact

14

that sealed indictments had been handed up against "at least *three* people," Levine's Mot. to Quash Ex. A, whereas no prior stories had specified the number of people charged. *See* Fox Mem. 6–8 [17]; Levine's Reply Mem. in Supp. of Mot. to Quash 8 [11]. The government asserts that this posed a significant risk that Salah Ahmed—the third of the indicted individuals and the only one not in custody at the time of the article's publication—might "ascertain from the leaked information in Levine's story that he might also have been charged" and flee Minneapolis. Opp'n to Mots. to Quash 25–26 [8]. In light of these two features of Levine's article, movants' suggestion that "it is not at all clear that the 'leak' the government was investigating was a leak at all" is unpersuasive. Fox Mem. 42 [17]. For all of the reasons discussed above, the Court finds no reason to discount the government's interest in enforcement of the subpoena.

On the other side of the ledger, movants have not shown that the burden of compliance is so great as to justify quashing the subpoena. First, the Court rejects movants' argument that requiring Levine to disclose all five of his sources is overly burdensome. Were the Court to credit this argument, it would encourage journalists seeking to avoid compliance with grand jury subpoenas to make the same claim—that is, that they simply cannot recall the sources they used for a given story. The Court will not go down this road, particularly where legitimate grand jury investigations are at stake. Second, movants' argument that Levine will face professional consequences if required to comply with the subpoena falls short. In light of the government's interest in enforcement, and in the absence of any further showing of unreasonableness, the potential for professional consequences is insufficient to justify quashing the subpoena. Indeed, were movants' argument sufficient in this context, it would be difficult to see how any subpoena issued to a member of the news media would pass muster under Rule 17(c). The Court thus finds

that movants, faced with the presumption of regularity that attaches to grand jury subpoenas, *see R. Enters.*, 498 U.S. at 301, have failed to carry their burden of showing unreasonableness here.

**III.   <u>CONCLUSION</u>**

For the reasons set forth above, it is hereby

ORDERED that Michael Levine's Motion [2] to Quash Grand Jury Subpoena and Fox News Network, LLC's Motion [17] to Quash Subpoena to Michael Levine are DENIED.


**SO ORDERED** this 25th day of July 2011.


ROYCE C. LAMBERTH
Chief Judge
United States District Court